476 A.2d 1287

**In re Nomination Petition of Roxanne H. JONES for the Nomination of the Democratic Party for Senator in the Pennsylvania General Assembly from the Third Senatorial District.**

**Appeal of Roxanne H. JONES.**

Supreme Court of Pennsylvania.

Argued March 8, 1984.
Decided May 9, 1984.

Michael T. McCarthy, Harrisburg, for appellant.

Lee C. Swartz, Harrisburg, James J. Binns, Philadelphia, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDER-MOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## ORDER

PER CURIAM.

There not having been established a valid challenge under the Election Code as to the candidacy for the nomination of Roxanne H. Jones, the Secretary of the Commonwealth is ordered to certify forthwith to the County Board of Elections of Philadelphia the name and ballot position of Roxanne H. Jones as candidate for nomination for Senator in the General Assembly of the Commonwealth of Pennsylvania from the Third Senatorial District.  Opinions to follow.

McDERMOTT and HUTCHINSON, JJ., dissent because the Petition to Set Aside Nomination Paper filed in the Commonwealth Court expressly relied on Section 977 of the Election Code.

LARSEN, J., did not participate in this matter.

## OPINION

NIX, Chief Justice.

This opinion is filed in support of the per curiam orders of this Court dated March 15, 1984 and March 28, 1984. The order of March 15, 1984 vacated an order entered by Judge Rogers, of the Commonwealth Court, setting aside the nomination petition that had been filed by Ms. Roxanne H. Jones, (hereinafter referred to as "Candidate"), who was seeking the Democratic Party's nomination for Senator in the General Assembly as the representative of the Third Senatorial District. The order of March 28, 1984 directed the Secretary of the Commonwealth to certify to the County Board of Elections of Philadelphia the name of the Candidate so that it would appear on the Democratic Ballot, within the said district, in the Primary Election to be held on April 10, 1984.

In order to accommodate the need for a prompt disposition, because of the exigencies entailed in the election process, we entered these orders without opinion. This opinion sets forth the reasons supporting those orders.

## I.

### A.

There are two individuals seeking the Democratic nomination for the office in question. One of the aspirants is the incumbent Senator, T. Milton Street, who was a member of a group of five (5) objectors initiating this matter.[1] The person seeking the office is the Candidate. The objectors

1. The other objectors were Sydney S. Simpson, Ernestine Pleasant, Billy Johnson and Fitzgerald Johnson. All five will be collectively referred to as the "objectors."

raised two complaints before Judge Rogers. One charged that the affidavit executed and sworn to by the Candidate misrepresented that a Statement of Financial Interest had been filed as required by section 4(b) of the State Ethics Act, Act of October 4, 1978, P.L. 883, No. 170, § 4, 65 P.S. § 404(b) (Supp.1983–84). This objection was dismissed on the authority of our decision in *Commonwealth, State Ethics Commission v. Baldwin*, 498 Pa. 255, 445 A.2d 1208 (1982).[2] The propriety of that ruling has not been raised before this Court. Of crucial importance is there has been no other objection raised specifically attacking the nomination petition in question.

The second argument of the objectors speculates that if the Candidate was successful in the primary election, and if she was also victorious in the general election, the next duly constituted Senate, following the November General Election of 1984 *might* refuse to seat her, if they concluded that she had not met all of the qualifications set forth in Article 2, section 5 of the Constitution of Pennsylvania.[3] Judge Rogers accepted the invitation to indulge in those conjectural lemmata, and determined, after making *his findings* that the Candidate was not "domiciled" within the Third Senatorial District on or before November 6, 1983, that the Candidate should not be permitted to run for the office. In response to this order we entered our order of March 15, 1984.

After the entry of our March 15, 1984 order there were no remaining impediments to the certification of the Candidate. Notwithstanding, the Secretary of the Commonwealth by communication dated March 26, 1984 refused to certify the name of the Candidate to be printed on the

2. Judge Rogers held that in the absence of a deliberate attempt to falsify the affidavit, the Candidate's failure to file her Statements of Financial Interest prior to filing her nomination petition, containing attestations that the Statements were previously filed, does not invalidate the nomination petition.

3. The qualification Ms. Jones allegedly lacks is the requirement that a Senator reside in his or her respective district for one year next before the election.

ballot, relying upon a Senate Resolution (Serial No. 114) dated March 20, 1984. Since this action by the Senate was devoid of legal authority and totally without efficacy, upon the request of the Candidate,[4] we entered the order of March 28, 1984 directing the Secretary to place the name of the Candidate upon the ballot for the April 10, 1984 primary election.

### B.

At the outset it is necessary to accurately identify the issue raised by Judge Rogers' order. Judge Rogers did not find that the candidate was not a resident of the address appearing in her nomination petition at the time she executed the candidate's affidavit. Further, it is agreed that her listed residence in the petition is within the Third Senatorial District. Most important, Judge Rogers *did not find any false statements* in the affidavit filed by the Candidate. Thus the issue *is not* whether a nomination petition may be set aside where it is established that the petition contained a false candidate's affidavit.[5] Judge Rogers did not attempt to assign a defect in the petition as the basis for his order requiring that the petition be set aside. Rather, he concluded that in view of his determination that appellant had failed to establish that she was an

---

**4.** The Candidate applied to this Court for an order to compel the Secretary of the Commonwealth, who was not a party to the initial action, to certify the Candidate's name and ballot position to the Philadelphia County Board of Elections in compliance with section 916 of the Election Code, Act of June 3, 1937, P.L. 1333, art. IX, § 916, as amended, 25 P.S. § 2876 (Supp.1983–84). The Secretary filed a responsive pleading. While a request for relief of this nature would generally be addressed to the Commonwealth Court in the first instance, *see* 42 Pa.C.S. § 761(a)(1), given the need for a prompt determination and the fact that the ultimate resolution of this matter would rest with this Court, we exercised our plenary jurisdiction. *See* 42 Pa.C.S. § 726.

**5.** It is clear that a false candidate's affidavit is a fatal defect which cannot be amended and would require the setting aside of the nomination petition. *In re Petition of Cianfrani,* 467 Pa. 491, 359 A.2d 383 (1976) (where the facts sworn to were not true when the affidavit was taken, such a defect cannot be cured and the petition was void and invalid).

"inhabitant" within the district on or before November 6, 1983,[6] she could not satisfy the provisions of Article 2, section 5 of the Pennsylvania Constitution and for that reason she should not be permitted to run for the office. Thus the question presented to us was whether or not Article 2, section 5 dictates that a court should make an *a priori* determination of whether a candidate meets the constitutional requirements for the office she seeks to obtain and on the basis of that judgment deny the candidate the right to put her name before the public for their consideration.

## II.

### A.

■ The argument presented relies upon the unstated premise that Article 2, section 5[7] is self-executing and authorizes court involvement. An analysis forces the conclusion that neither Article 2 in its entirety, nor section 5 specifically, confers authority in the court to act in this area.

6. The Candidate's affidavit was not filed until January 30, 1984 and the statements concerning residence contained in the affidavit related to the time of execution of the affidavit and not November or October, 1983. The objectors did allege in their petition filed in the Commonwealth Court that the Candidate falsely swore in her affidavit "as to the location of her residence at the time she signed the Candidate's Affidavit". Judge Rogers did not make a finding as to this allegation. Before this Court the objectors abandoned that claim and relied solely upon the theory of Judge Rogers.

We of course had the option of remanding the cause back to Judge Rogers to determine whether the petition itself was defective because of false swearing. However, because of the exigencies of the circumstances, objectors' willingness to rely solely upon the theory offered by Judge Rogers, and the strong policy to favor enfranchisement we elected to decide the matter on the only question then before us.

7. Pa. Const. art. 2 § 5 states:
Qualifications of members
Senators shall be at least twenty-five years of age and Representatives twenty-one years of age. They shall have been citizens and inhabitants of the State four years, and inhabitants of their respective districts one year next before their election (unless absent on the public business of the United States or of this State, and shall reside in their respective districts during their terms of service).

Article 2 is concerned with the composition, powers and duties of the legislature. Nothing in this article even remotely suggests the conferrence of jurisdiction upon the courts to test the qualifications of the members of the General Assembly.[8] Indeed, section 9 of Article 2 expressly states that each body of the General Assembly shall be the judge of the qualifications of its members.[9] Moreover, Article 2, section 5 by its express terms refers only to the qualifications of the *members* of the body. There is no reference to persons who file to run for the office.

■ Aside from the obvious conclusion that Article 2 was not designed to confer judicial power, we would also be restrained from intervening at this juncture by virtue of the doctrine of separation of powers of the three independent branches of government. We note the existence of a body of case law which advocates that the language used in section 9 is properly interpreted as placing the exclusive jurisdiction in the legislative body and divesting the courts of all jurisdiction in the matter. *Buskey v. Amos*, 294 Ala. 1, 310 So.2d 468 (1975) (Alabama Constitution vests legislature with sole and exclusive power to judge qualifications of members and deprives courts of jurisdiction of such matters.); *In re McGee*, 36 Cal.2d 592, 226 P.2d 1 (1951) (California Constitution confers exclusive jurisdiction upon assembly to judge qualifications of assemblymen and as-

8. All of the arguments of the objectors rely upon the findings of fact of Judge Rogers. These findings have been hotly contested by the Candidate and it is further charged that Judge Rogers incorrectly assigned the burden of proof upon the Candidate. In view of our disposition we did not reach those issues. What is here significant is that section 5 did not empower Judge Rogers or any other court to make such findings.

9. Pa. Const. art. 2 § 9 states:
    The Senate shall, at the beginning and close of each regular session and at such other times as may be necessary, elect one of its members President pro tempore, who shall perform the duties of the Lieutenant Governor, in any case of absence or disability of that officer, and whenever the said office of Lieutenant Governor shall be vacant. The House of Representatives shall elect one of its members as Speaker. Each House shall choose its other officers, and shall judge of the election and qualifications of its members.

sembly cannot authorize courts to decide contests after primary elections); *Mills v. Newell*, 30 Colo. 377, 70 P. 405 (1902) (Under Colorado Constitution, senate alone has jurisdiction to determine whether vacancy exists in senate district; the court has no authority to decide the question.); *State ex rel. Biggs v. Corley*, 36 Del. 135, 172 A. 415 (1934) (Courts have no jurisdiction to consider question of implied resignation or abandonment by senator or representative since Delaware Constitution vests in each house the right, power and authority to judge election and qualifications of its members.); *McPherson v. Flynn*, 397 So.2d 665 (Fla. 1981) (Under Florida Constitution each house is the sole judge of the qualifications of its members; the courts have no jurisdiction to determine constitutional qualifications.); *Burge v. Tibor*, 88 Idaho 149, 397 P.2d 235 (1964) (Idaho Constitution makes each house sole judge of election and qualifications of its members.); *State ex rel. Acker v. Reeves*, 229 Ind. 126, 95 N.E.2d 838 (1951) (Indiana Constitution's grant of jurisdiction to the general assembly to judge qualifications of its members excludes jurisdiction from courts.); *State ex rel. Turner v. Scott*, 269 N.W.2d 828 (Iowa 1978) (Power granted by Iowa Constitution to legislature to judge election and qualifications of its members cannot be exercised by the courts.); *State ex rel. Martin v. Gilmore*, 20 Kan. 551 (1878) (Kansas Constitution makes each house the ultimate tribunal as to the qualifications of its members; this power is exclusive and cannot be abridged.); *Covington v. Buffet*, 90 Md. 569, 45 A. 204 (1900) (Under provision of Maryland Constitution vesting senate with power to judge the election and qualifications of its members, the senate has exclusive authority to determine whether a vacancy in the senate exists, and the courts have no jurisdiction to decide such a question.); *Dinan v. Swig*, 223 Mass. 516, 112 N.E. 91 (1916) (Massachusetts Constitution vests power to determine election and qualifications of members exclusively in each branch; this power is comprehensive, full and complete.); *People ex rel. Drake v. Mahaney*, 13 Mich. 481 (1865) (Power to judge election and qualifications of members is expressly conferred on the

legislature and the courts have no power to review the legislature's actions.); *State v. Banks,* 454 S.W.2d 498 (Mo.1970), *cert. denied,* 400 U.S. 991, 91 S.Ct. 452, 27 L.Ed.2d 449 (1971) (Power to be sole judge of qualifications of its own members is textually committed by the Missouri Constitution to the House of Representatives; attorney general's challenge to qualifications of representatives thus presents a nonjusticiable political question.); *State ex rel. Boulware v. Porter,* 55 Mont. 471, 178 P. 832 (1919) (Montana Constitution vests plenary and exclusive authority in each house to judge the election and qualifications of its members; the house's decision is conclusive upon the courts.); *Bingham v. Jewett,* 66 N.H. 382, 29 A. 694 (1891) (Under the New Hampshire Constitution the house is the sole judge of the qualifications of its members and the courts are not authorized to determine the question of membership.); *Sherrill v. O'Brien,* 188 N.Y. 185, 81 N.E. 124 (1907) (Opinion of Cullen, C.J.) (Each house has not only the exclusive power but the exclusive right to judge the title of any member to a seat therein; the courts have no jurisdiction to make such a determination.); *Lessard v. Snell,* 155 Or. 293, 63 P.2d 893 (1937) (In view of the senate's power under the Oregon Constitution to judge the qualifications of its members, the courts have no jurisdiction to determine the qualifications of a senator.); *Culbertson v. Blatt,* 194 S.C. 105, 9 S.E.2d 218 (1940) (Under the South Carolina Constitution the senate and house judge the election and qualifications of their members; this is not a field in which the courts may exercise judicial power.); *State ex rel. Schieck v. Hathaway,* 493 P.2d 759 (Wyo.1972) (Under the Wyoming Constitution the house is the sole judge of the qualifications of its members; the courts have no jurisdiction to consider a challenge to a representative's qualifications.).

The theory of nonjusticiability in this area flows from the concept of the separation of powers. *Baker v. Carr,* 369 U.S. 186, 210, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962). "The vesting of authority to pass upon the qualifications of

[elected] prospective legislators in the legislative body is deemed an essential concomitant of our tripartite form of government affording to the legislative branch an independence requisite to its successful functioning." *Harrington v. Carroll*, 428 Pa. 510, 522, 239 A.2d 437, 443 (1968) (Jones, former C.J., then Jones, J., concurring). This view of the proper relationship between the various branches of our government was obviously embraced by the people of this Commonwealth and set forth in section 9 in clear and unequivocal terms.

■■■ The rule of nonjusticiability in this area is not to be construed as an absolute prohibition against judicial consideration of the constitutional qualifications of one claiming an office. Manifestly, the court has jurisdiction to entertain a claim of an elected prospective office holder that his or her right to sit has been unconstitutionally denied. *See Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969); *Bond v. Floyd*, 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966); *cf. Sweeney v. Tucker*, 473 Pa. 493, 375 A.2d 698 (1977). However, a right to intervene in that situation does not flow from the constitutional section setting forth the qualifications, but rather from our well recognized jurisdiction to intervene when there is an allegation of an infringement of constitutional rights. *See, e.g., Sweeney v. Tucker, supra; Stander v. Kelley*, 433 Pa. 406, 250 A.2d 474 (1969), *cert. denied and appeal dismissed sub nom. Lindsay v. Kelly*, 395 U.S. 827, 89 S.Ct. 2130, 23 L.Ed.2d 738 (1969). The consideration of the qualifications as set forth by the constitutional mandate is merely tangential to the underlying inquiry. Additionally, the judicial remedy of quo warranto is available to test an individual's right to hold a public office. *Spykerman v. Levy*, 491 Pa. 470, 421 A.2d 641 (1980); *League of Women Voters of Lower Merion Tp. v. Board of Commissioners of Lower Merion Tp., Montgomery County*, 451 Pa. 26, 301 A.2d 797 (1973); *DeFranco v. Belardino*, 448 Pa. 234, 292 A.2d 299 (1972); *City of Philadelphia v. Sacks*, 418 Pa. 193, 210 A.2d 279 (1965). Here again the court is not directly involved in

evaluating constitutional qualifications, but rather in preserving the integrity of our public institutions. *See Commonwealth ex rel. Schermer v. Franek*, 311 Pa. 341, 166 A. 878 (1933).

Not only is the section 5 argument fatally flawed because of the lack of a jurisdictional predicate and the involvement of a nonjusticiable issue, its application under the instant facts would also be premature and speculative. To attempt to justify this premature consideration on the ground that otherwise the Candidate may at some later date be refused membership by the Senate and thereby disenfranchise the voters of her district represents the most blatant sophistry. If someday these events do occur, the situation can be easily remedied by a special election. Act of June 3, 1937 P.L. 1333, art. VI, § 628, 25 P.S. § 2778. In such event, the voters will have the opportunity to select another person *of their choice* to serve in that capacity. In contrast, to deprive the Candidate of the right to seek the seat at this time would not only disenfranchise her, but would in fact remove the opportunity of a choice for all of the Democratic voters in that particular senatorial district.[10]

In summary, Article 2, section 5 does not by its terms grant jurisdiction to the courts to inquire into the qualifications of one seeking to run for the office. Moreover, the legislature has not expressly attempted to confer such power. The courts have been granted limited (not plenary) authority by the legislature over the election process. *See infra.* However, here the objectors and Judge Rogers relied solely on Article 2, section 5 as the predicate for the jurisdiction. Such a position must be rejected.

### B.

Any valid analysis of the instant situation must begin with the recognition that we are here concerned with the

10. At the present time there are only two candidates seeking the Democratic nomination. To remove the Candidate's name from the ballot would in effect deprive the Democratic voters of that district of the opportunity to make a choice.

elective process. This presents a distinctly different question from whether an elected prospective member should be seated. The objectors are seeking to deny the Candidate the right to run for the office. This is materially different from challenging her right to be seated in the event of her election. The question properly posed is whether the objectors have established any legally cognizable basis for denying the Candidate the opportunity to seek the office.

■ The authority to regulate the election process is vested in the Legislature. *Shankey v. Staisey*, 436 Pa. 65, 257 A.2d 897 (1969); *Harsham Township Election Case*, 356 Pa. 60, 51 A.2d 692 (1947); *Thompson v. Morrison*, 352 Pa. 616, 44 A.2d 55 (1945); *Wilson v. Philadelphia*, 319 Pa. 47, 179 A. 553 (1935); *Wasson v. Woods*, 265 Pa. 442, 109 A. 214 (1919); *Winston v. Moore*, 244 Pa. 447, 91 A. 520 (1914). Because our jurisdiction in the area flows from statute rather than common law, it cannot be extended by implication beyond the prescription of the act from which it originates. *Harrington v. Carroll, supra; Gunnett v. Trout,* 380 Pa. 504, 112 A.2d 333 (1945); *Greene Township Malt Beverage License Referendum Contest*, 331 Pa. 536, 1 A.2d 670 (1938); *Auchenbach v. Seibert*, 120 Pa. 159, 13 A. 558 (1888). Thus any argument seeking to justify jurisdiction in this matter based on prior judicial decision is fatally defective. Absent an identification of the specific statutory authority from which jurisdiction arises, the courts are powerless to intervene.[11] *Harrington v. Carroll, supra; Gunnett v. Trout, supra; Greene Township Malt Beverage License Referendum Contest, supra; Auchenbach v.*

11. It is equally fallacious to attempt to distort the concept of "liberal construction" to justify the allowance of court intervention. Such an approach in this instance would be tantamount to licensing courts to act without a scintilla of authority. Moreover, we have approved the liberal construction of the Election Code so as not to deprive an individual of his right to run for office or the voters of their right to elect the candidate of their choice. *Wieskerger Appeal*, 447 Pa. 418, 290 A.2d 108 (1972); *Perles v. Hoffman*, 419 Pa. 400, 213 A.2d 781 (1965); *Petition of Ross*, 411 Pa. 45, 190 A.2d 719 (1963); *Miller Election Contest Case*, 351 Pa. 469, 41 A.2d 661 (1945); *Cole's Election*, 223 Pa. 271, 72 A. 510 (1909). Here the objectors sought to accomplish just the opposite.

*Seibert, supra.* We therefore reject out of hand any attempt to support the contrary view by reliance upon earlier court decisions. What is significant is that the cited decisions fail to establish the statutory source of jurisdiction.[12]

■ In this context it must be remembered that the mere existence of a dispute does not in and of itself provide authority for judicial intervention. There must be jurisdiction in a court over the subject matter before it can proceed to hear and determine the matter in controversy. *In re: Jones & Laughlin Steel Corp.*, 488 Pa. 524, 412 A.2d 1099 (1980); *Cooper-Bessemer Co. v. Ambrosia Coal & Construction Co.*, 447 Pa. 521, 291 A.2d 99 (1972); *Jones Memorial Baptist Church v. Brackeen*, 416 Pa. 599, 207 A.2d 861 (1965). This rule is without exception. *See Pennsylvania Railroad Co. v. Pennsylvania Public Utility Commission*, 396 Pa. 34, 152 A.2d 422 (1959). Of equal significance the unbridled and unrestrained exercise of judicial authority is as threatening to the core of our democracy as any effort to undermine the integrity of the election process. To foster one of these evils in an effort to check the other would be tantamount to courting disaster.

12. *Lesker Case*, 377 Pa. 411, 105 A.2d 376 (1954) (an attack upon a nomination petition charging failure to meet residency requirements, dismissed for lack of proof of domiciliary intent), contained vacua as to the effect of failure to particularize objections as required by section 977 and failure to articulate a basis for jurisdiction. Therefore that decision provides no guidance here.

In re: *Nomination Petition of Vidmer*, 497 Pa. 642, 444 A.2d 100 (1982) (a per curiam affirmance of 65 Pa.Cmwlth. 562, 442 A.2d 1203) (an objection to a nomination petition purporting failure to meet residency requirements, sustained), constitutes no precedent of this Court. We may affirm a trial court judgment on any grounds without regard to the grounds upon which the trial court itself relied. *E.J. McAleer & Co. v. Iceland Prod.*, 475 Pa. 610, 381 A.2d 441 (1977); *Mazer v. Williams Brothers Company*, 461 Pa. 587, 593 n. 6 337 A.2d 559, 562 n. 6 (1975); *Gilbert v. Korvette's Inc.*, 457 Pa. 602, 604 n. 5, 327 A.2d 94, 96 n. 5 (1974), *Prynn Estate*, 455 Pa. 192, 197 n. 9, 315 A.2d 265, 267 n. 9 (1974); *Concord Township Appeal*, 439 Pa. 466, 469, 268 A.2d 765, 766 (1970); *Ridley Township v. Pronesti*, 431 Pa. 34, 37, 244 A.2d 719, 720 (1968); *Sherwood v. Elgart*, 383 Pa. 110, 117 A.2d 899 (1955). Thus, per curiam affirmance does not necessarily mean that this Court embraced the reasoning of the trial court.

### C.

The sole and exclusive remedy for challenging a person's right to run for political office in Pennsylvania is provided by section 977 of the 1937 Pennsylvania Election Code,[13] Act of June 3, 1937, P.L. 1333, art. IX, § 977, as amended, 25 P.S. § 2937 (Supp.1983–84). *Brunwasser v. Fields*, 487 Pa. 283, 409 A.2d 352 (1979); *Harrington v. Carroll, supra; Lurie v. Republican Alliance*, 412 Pa. 61, 192 A.2d 367 (1963); *Oteri Appeal*, 372 Pa. 557, 94 A.2d 772 (1953); *Thompson v. Morrison*, 352 Pa. 616, 44 A.2d 55 (1945); *Kane v. Morrison*, 352 Pa. 611, 44 A.2d 53 (1945).

■ In the absence of a demonstration of a specific defect in the nomination petition under section 977, a candidate cannot be precluded from running for the office for which the nomination petition was filed. Section 977 sets forth the procedure to be followed in pursuing an objection, including a time schedule in which the various steps of the process must occur. The section also expressly defines when the court may find the nomination petition or paper defective and delineates the court's power to grant amendment. *Petition of Ross*, 411 Pa. 45, 190 A.2d 719 (1963); *Ochman Appeal*, 364 Pa. 525, 73 A.2d 34 (1950). Most germane here is that section 977 expressly requires that the objections must be specifically set forth.[14]

13. As noted by former Chief Justice Roberts, then Justice Roberts: No amount of histrionics, legal irrelevancies or judicial smoke screens can conceal the simple issue, the resolution of which disposes of the present appeal.

\* \* \* \* \* \*

Thus, the issue is framed: Is section 977 of the Pennsylvania Election Code the *sole* and *exclusive* remedy for challenging a person's right to run for political office in Pennsylvania? On July 6, 1967, this Court in *Jaspan v. Osser*, Supreme Court, Pennsylvania, Eastern District, Jan. Term, 1967, No. 393, held that it is. There is no reason to stray from that holding now.

*Chalfin v. Specter*, 426 Pa. 464, 477, 233 A.2d 562, 568 (1967) (Roberts, J. concurring, joined by Jones and O'Brien, JJ.) (Footnote omitted).

14. This requirement is more than a technical rule of procedure, but rather reflects the strong policy in this Commonwealth in favor of enfranchisement. *In re Contest of 1979 General Election for the Office*

■ As has been repeatedly stated, there was a failure to set forth this argument in the specific terms of section 977; even more glaring is the fact that the argument is not in any way related to an objection to the nomination petition under that section. To the contrary, the clear implication of the objectors' articulation of their position was that Article 2, section 5 itself conferred jurisdiction for that complaint in the courts. Thus the objectors did not seek to bring the Article 2, section 5 argument within the purview of section 977.[15]

The dissent of Mr. Justice Hutchinson attempts to change the issue to that of false swearing in an effort to overcome objectors' obvious failure to relate their Article 2, section 5 argument to a recognized objection under section 977.[16] He frames this issue by embarking upon a tortuous and convoluted path of reasoning which employs compound assumptions. Beginning with the language of section 977, 25 P.S. § 2937 ("If the Court shall find that said nomination petition ... was not filed by persons entitled to file the same, it shall be set aside"), Justice Hutchinson assumes "entitled to file the same" incorporates section 910, 25 P.S. § 2870, which includes in the required contents of affidavits of candidate a statement "that he is eligible for such office."

The dissent, after the tortuous journey reaches this point, premises its argument upon the bald statement "A person who cannot serve is not entitled to file." It is most significant that in spite of that dissent's liberal use of citations

*of District Attorney of Washington County, Pennsylvania,* 489 Pa. 404, 414 A.2d 310 (1980); *In re Recount of Ballots,* 457 Pa. 279, 325 A.2d 303 (1974); *Wieskerger Appeal,* 447 Pa. 418, 290 A.2d 108 (1972); *James Appeal,* 377 Pa. 405, 105 A.2d 64 (1954).

**15.** We note that the dissent of Mr. Justice Hutchinson begrudgingly concedes that a question as to whether or not the constitutional qualifications have been met "does implicate an issue for which there is arguably a plain textual commitment of authority to a legislative body."

**16.** Our law requires a deliberate misrepresentation to constitute false swearing in a candidate's affidavit. *See Commonwealth, State Ethics Commission v. Baldwin,* 498 Pa. 255, 445 A.2d 1208 (1982). A mere inaccuracy does not rise to that level.

generally, not one case, not a scintilla of authority nor a prior decision is set forth to support this premise. To the contrary, it does not necessarily follow that the legislature intended to use the election process as a device to screen against every possible impediment to holding office.

Moreover, Mr. Justice Hutchinson, after equating "entitled to file" with "eligible for office", then makes the extraordinary leap of assuming all of the laws of the Commonwealth, including Article 2, section 5, pertaining to qualifications for holding public office are incorporated in section 910.[17]

## D.

In summary the decision of Judge Rogers, which was relied upon by objectors as their sole basis for relief,

17. For a *sampling* of the myriad provisions which touch upon qualifications to hold the various public offices in this Commonwealth, *see, e.g.,* Pa. Const. art. 2, §§ 6, 7; art. 4, § 5; art. 5, §§ 12, 17; art. 6, § 2; Act of August 9, 1955, P.L. 323, §§ 402, 602, 702, 801, 1206, 1401, 16 P.S. §§ 402 (Supp.1983–84), 602, 702, 801 (Supp.1983–84), 1206 (Supp. 1983–84); 1401 (Supp.1983–84); Act of July 28, 1953, P.L. 723, art. VI, § 602; art. VIII, § 801; art. XII, § 1206; art. XIV, § 1401, 16 P.S. §§ 3602, 3801 (Supp.1983–84), 4206 (Supp.1983–84), 4401 (Supp.1983–84); Act of June 23, 1931, P.L. 929, No. 312, § 1, 16 P.S. § 7509; Act of April 26, 1883, P.L. 15, § 1, as amended, 16 P.S. § 7702; Act of May 27, 1841, P.L. 400, § 3, as amended, 16 P.S. § 9431; Act of March 10, 1949, P.L. 30, art. III, § 322; art. X, §§ 1002, 1003, 24 P.S. §§ 3–322, 10–1002, 10–1003 (Supp.1983–84); 42 Pa.C.S. §§ 3101, 3111–3119, 3301; Act of June 25, 1919, P.L. 581, art. IV, § 5, 53 P.S. §§ 12193, 12195; Act of March 7, 1901, P.L. 20, art. 1, § 1; art. XIV, § 3, as amended, 53 P.S. §§ 22182 (Supp.1983–84), 22223; Act of June 23, 1931, P.L. 932, art. X, § 1001; art. XII, § 1201; art. XIV, § 1401; art. XVII, § 1701; art. XXV, § 2501, as amended, 53 P.S. §§ 36001 (Supp. 1983–84), 36201 (Supp.1983–84), 36401 (Supp.1983–84), 36701 (Supp. 1983–84), 37501; Act of February 1, 1966, P.L. (1965) ——, No. 581, §§ 841, 861, 1021, 1022, 53 P.S. §§ 45841, 45861, 46021, 46022; Act of June 24, 1931, P.L. 1206, art. V, §§ 501, 511, 525, as amended, 53 P.S. §§ 55501, 55511, 55525; Act of May 1, 1933, P.L. 103, art. IV, §§ 401, 411, as amended, 53 P.S. §§ 65401 (Supp.1983–84) 65411 (Supp.1983–84); Act of May 15, 1874, P.L. 186, §§ 1–16, as amended, 65 P.S. §§ 1–16; Act of April 3, 1956, P.L. 1382, No. 441, § 1, 65 P.S. § 17; Act of October 4, 1978, P.L. 883, No. 170, §§ 4–5, 65 P.S. §§ 404–405 (Supp.1983–84). Absent explicit statement of such multiple incorporation, it would be unreasonable to infer the legislature intended such an onerous burden be placed upon one seeking to run for elected office. *See* 1 Pa.C.S. § 1922(1).

premised jurisdiction on Article 2, section 5. For the foregoing reasons Article 2, section 5 did not confer the jurisdiction sought to be exercised. Absent a justiciable issue under section 977 which was not raised by Judge Rogers' ruling we entered the order of March 15th.

## III.

Addressing the basis for our order of March 28, 1984, we are confronted with presenting a lucid exposition of an incredible scenario. The Secretary of the Commonwealth is mandated by section 916 of the Election Code, Act of June 3, 1937 P.L. 1333, art. IX, § 916, as amended, 25 P.S. § 2876 (Supp.1983–84) to certify the name of a candidate to the County Board of Elections to be printed upon the voting machine ballot labels and absentee ballots. Even though the order of March 15th had vacated the only impediment to the certification of the Candidate, in reliance upon Senate Resolution 114, the Secretary took the position that the Candidate's name should not appear on the ballot. Senate Resolution 114 *purported* to be a decision by the presently constituted body that the Candidate, if elected in the General Election of November 6, 1984, could not be a member of the new body which will exist on and after the first day of December, 1984.[18]

This unprecedented action by the Senate was totally without legal authority and represented an unabashed effort of one party to control the selection of the rival party's candidate. First, it is manifest that the power conferred upon the Senate to "judge ... [the] qualifications of its members" under section 9 of Article 2, refers to the members of that body and is not a warrant to allow one body to determine the composition of a body which will succeed it. *Cf. Beckert v. Warren*, 497 Pa. 137, 439 A.2d 638 (1981); *Scott v. Philadelphia Parking Authority*, 402 Pa. 151, 166 A.2d 278 (1960); *Mitchell v. Chester Housing Authority*, 389 Pa. 314, 132 A.2d 873 (1957); *Common-*

18. Pa. Const. art. 2, § 2 provides that the new Senate convenes on the first day of December after the election.

*wealth ex rel. Fortney v. Bartol,* 342 Pa. 172, 20 A.2d 313 (1941); *Moore v. Luzerne County,* 262 Pa. 216, 105 A. 94 (1918); *McCormick v. Hanover Tp.,* 246 Pa. 169, 92 A. 195 (1914). Even if the proper body was making such a decision, it is beyond question that the elected prospective member would be entitled to due process in such a procedure. *Sweeney v. Tucker, supra.*

A primary election is a partisan election by its very nature. In this contest the Democratic voters of that district are selecting their standard bearer to run for the office. Only the duly enrolled and registered members of that party can participate in the selection. Act of June 3, 1937, P.L. 1333, article VIII, § 802, 25 P.S. § 2832. Unlike other jurisdictions, this state does not permit crossover voting; rather it requires each party be permitted to select its own candidates for office without interference from rival parties.[19] *See In re Street,* 499 Pa. 26, 451 A.2d 427 (1982); *Packrall v. Quail,* 411 Pa. 555, 192 A.2d 704 (1963); *Magazzu Election Case,* 355 Pa. 196, 49 A.2d 411 (1946). Since this is a selection by the members of a political party, clearly they would be desirous of selecting a standard bearer who shared their political views and who could best articulate their needs and aspirations. *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983); *Lubin v. Panish,* 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974).

This area, being one of the most depressed in the state, is particularly in need of its suffrage, free of dilution and manipulation. To allow the voters of one party in this district to have their choice of their candidate for the office determined by a rival political party of the Senate [20] would

19. Judicial elections and elections of school directors are the only exceptions to this rule. *In re Street,* 499 Pa. 26, 32 n. 7, 451 A.2d 427, 430 n. 7 (1982).

20. The vote of the Senate on March 20, 1984 in favor of the resolution calling for the removal of the Candidate from the ballot was 26 votes yea and 18 votes nay. The yea votes were cast by the 26 Republican members of the Senate. 1984 Pa.Legis.J.-Senate, p. 1876.

be unconscionable and should not be countenanced by this or any other court.

█ It is well recognized that the preservation of the integrity of the electoral process is a legitimate and valid state goal. *Anderson v. Celebrezze, supra; Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974); *Kusper v. Pontikes,* 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973); *Rosario v. Rockefeller,* 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973); *Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). *See Commonwealth, State Ethics Commission v. Baldwin, supra; In re Petition of Cianfrani,* 467 Pa. 491, 359 A.2d 383 (1976). *Cf. In re Street, supra; Packrall v. Quail, supra.* As previously stated, our Election Code at section 802 has clearly established only the members of a political party should participate in the nomination of its candidates. The result sought to be achieved here by a rival party's majority in the Senate would have been the rankest form of "party raiding." A wealth of precedent has condemned such a practice. *Democratic Party of the United States v. Wisconsin,* 450 U.S. 107, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981); *Storer v. Brown, supra. See Kusper v. Pontikes, supra; Rosario v. Rockefeller, supra; Ferency v. Austin,* 666 F.2d 1023 (6th Cir. 1981).

█ Accordingly, since the Candidate has filed a valid nomination petition and the action by the Senate was totally devoid of legal efficacy, the March 28th order directing that the Secretary certify the Candidate's name was entered.

FLAHERTY, J., concurs in the result.

McDERMOTT and HUTCHINSON, JJ., filed dissenting opinions.

LARSEN, J., did not participate in the consideration or decision of this case.

McDERMOTT, Justice, dissenting.

The people may specify the qualification of those who serve them. The issue here is simply who shall determine when those qualifications have been met. There are two bodies so empowered. Under Article 2, section 9 of the Pennsylvania Constitution, the legislature is empowered to determine the qualifications of its members. The opinion of Mr. Chief Justice Nix bespeaks that authority. Under the Election Code,[1] the courts are empowered to rule on the qualification of those who aspire to the legislative office. The opinion of Mr. Chief Justice Nix bespeaks that authority. The contratemps here is that the opinion confined itself exclusively to the legislative prerogatives and avoided, with almost loving impercipience, the authority granted to the courts under the Election Code. The rationale appears to be that the objectors neither raised nor argued the Election Code. Mr. Justice Hutchinson, in his able dissent, adequately dissolves that contention.

The Election Code was designed to protect the electoral process, that the franchise would not be squandered on the imposter, fraud or comedian. To ignore that duty, in this case, is to hide in a semantic sanctuary, believing that special elections will absolve our neglect. Given the intimations offered here, special elections might become routine harbingers of Spring.

Judge Rogers in the Commonwealth Court grasped and decided the issue with his usual perspicacity. We should let his judgment stand.

I dissent and join Mr. Justice Hutchinson.

Mr. Justice Hutchinson joins in this Dissenting Opinion.

HUTCHINSON, Justice, dissenting.

Objections to Roxanne Jones's candidacy for State Senator from the Third Senatorial District, precisely set forth in terms of Section 977 of our Election Code, were properly before the Court in this matter entrusted to its original

1. Act of June 3, 1937, P.L. 1333, 25 P.S. § 2601 *et seq., as amended.*

jurisdiction by the General Assembly. Act of June 3, 1937, P.L. 1333, § 977, *as amended,* 25 P.S. § 2937 (Supp.1983–84). *See* 42 Pa.C.S. § 764(2); *In re Vidmer,* 65 Pa.Cmwlth. 562, 442 A.2d 1203, *aff'd per curiam,* 497 Pa. 642, 444 A.2d 100 (1982).

Unlike a dispute over whether an *elected candidate,* i.e. a Senator elect, may take his seat in the Senate, the question of whether a candidate can meet constitutional qualifications for office is justiciable on timely objection to his nomination petition.[1] *See* 25 P.S. § 2937. I, therefore, dissent from the several orders of this Court in this election matter, except for our dismissal of the Senate's petition to intervene. Moreover, for the reasons which follow, I am deeply concerned about the implications of the reasoning set forth in the opinion supporting the orders of the Court.

## I

On January 30, 1984, Roxanne H. Jones filed a nomination petition to have her name printed upon the Democratic party's official primary ballot for the office of Senator in the General Assembly for the Third Senatorial District. Both her nomination petition and the attached candidate's affidavit, required by Section 910 of the Pennsylvania Election Code, *as amended,* 25 P.S. § 2870, (Supp.1983–84) set forth her claim that she resided at 1714 North Bambrey Street. Section 910 provides in pertinent part that the candidate must file an affidavit with his nomination petition stating "(a) his residence, with street and number ...; (b) his election district ...; (d) *that he is eligible for such office;*" Emphasis added. Section 977 of the Election Code provides, *inter alia:*

All nomination petitions and papers received and filed within the periods limited by this act shall be deemed to

1. Both the objectors and candidate Jones understandably took it for granted that the challenge was justiciable. The issue of justiciability was raised *sua sponte* ignoring the long-standing practice of considering such challenges under the Election Code. *See infra,* at 75. In this connection we note that the issue the plurality considers is precisely one of justiciability, not of jurisdiction.

be valid, unless, within seven days after the last day for filing said nomination petition or paper, a petition is presented to the court specifically setting forth the objections thereto, and praying that the said petition or paper be set aside.

Relying on the absence of "valid" objections this Court ordered the Secretary of the Commonwealth to certify Ms. Jones's candidacy to the local Election Board. However, within the statutory seven day period Milton Street, a rival candidate, and other Objectors had filed a petition in Commonwealth Court asking it to set aside Ms. Jones's nomination petition. The plurality twice avoided dealing with that petition by finding it did not present a "justiciable" issue.

In their petition below the Objectors said first:

1. This Honorable Court has original jurisdiction of this Petition pursuant to .... 977 of the Pennsylvania Election Code.

After setting forth their identities and the fact that Ms. Jones had filed a nomination petition as a Democratic candidate for State Senator from the Third Senatorial District in the 1984 Primary the Objectors went on to say:

4. Article 2, Section 5 of the Constitution of ... Pennsylvania provides that 'Senators shall have been ... inhabitants of the [sic] respective districts one year next before their election....'

5. Roxanne H. Jones does not meet the requirements of Article 2, Section 5 ... in that she has not been nor is a resident of the Third Senatorial District ... and, in fact, resides outside said District.

6. Notwithstanding ... she executed a Candidate's Affidavit under oath, swearing that she resided ... at 1714 North Bambrey Street, Philadelphia, which address is located within the Third Senatorial District.

The Objectors' petition concluded:

8. Roxanne H. Jones has violated the Pennsylvania Election Code and the Constitution of Pennsylvania in swearing falsely in her Candidate's Affidavit ... as to the

location of her residence at the time she signed the Candidate's Affidavit....

Section 977, 25 P.S. § 2937, also provides:

If the court shall find that said nomination petition is defective under section 976 [25 P.S. § 2936] ... *or was not filed by persons entitled to file* the same, it shall be set aside.

Emphasis added.

A person who cannot serve is not entitled to file. This is the obvious reason why Section 910 requires a candidate to state in his affidavit that he is "eligible" for the office he seeks. Moreover, under Election Code Section 910, set forth *supra,* at 2, the candidate's affidavit is a necessary part of her nomination petition. As this Court aptly said in affirming an order striking a nomination petition because the candidate falsely swore he was a member of the Democratic party:

The requirements of sworn affidavits are to insure the legitimacy of information crucial to the election process. Thus, the policy of the liberal reading of the Election Code cannot be distorted to emasculate those requirements necessary to assure the probity of the process. [4] It has not been argued nor could it be successfully maintained that the failure to affix an affidavit of the candidate would not be a fatal defect. *Gregg v. Morrison,* 59 Dauph. 35 (1948); *Howe v. Campbell,* 60 [Pa.] D & C 10 (1947). As a corollary it must necessarily follow that a false affidavit must be *at least* equated with the failure to execute the affidavit. Without inquiring into the intentions of the parties and assuming the absence of any wrongful intent, the fact remains that when the affidavit was taken the facts sworn to were not true. Such a defect cannot be cured by subsequent conduct and the petition was therefore void and invalid.

*In re Petition of Cianfrani,* 467 Pa. 491, 494, 359 A.2d 383, 384 (1976). *See also In re Carlson,* 60 Pa.Cmwlth. 170, 430 A.2d 1210, *aff'd per curiam* 494 Pa. 139, 430 A.2d 1155 (1981).

It is apparent from the foregoing that the General Assembly has entrusted to the judiciary *a priori* determination of the presence of the impediment our Constitution's Article II, Section 5, places against a non-resident's representing a Senatorial District. This is done through timely Election Code challenges to such qualifications. It is also apparent that the Objectors plainly raised Ms. Jones's constitutional disqualification, as our Election Code cases have heretofore permitted, by pleading the falsity of the affidavit required by Election Code Section 910, with respect to residency. *In Re Vidmer, supra. In Re Carlson, supra.*

Thus, the issue of whether Roxanne Jones met Article II, Section 5's residency requirements was properly before the court.[2] As such Judge Rogers had a duty to decide that issue, unless the General Assembly has improperly granted the judiciary power in the Election Code to act in matters either inappropriate to the exercise of judicial power or plainly reserved to other coordinate branches by constitutional text.

## II

The question of whether Ms. Jones met the constitutional requirements of residency within the District she sought to serve for the requisite time prior to election is appropriately justiciable since our Constitution has no plain textual commitment of this Election Code matter to the Senate or any other coordinate body. The numerous citations in the opinion supporting the Court's orders are not precedent for a conclusion of non-justiciability. Indeed, the precedent in Pennsylvania and elsewhere is all the other way. Our courts have heretofore routinely considered and determined such matters without objection. *Lesker Case*, 377 Pa. 411, 105 A.2d 376 (1954); *In re Carlson, supra, In re Vidmer, supra; In re: Nomination Petition of Miller*, 94 Dauph. 186 (1971); *Kelly Nomination*, 49 [Pa.] D & C.2d 780

---

**2.** The allegations of the Objectors' petition are plain and concise as to both fact and theory. They satisfy the requirements of our Rules of Civil Procedure. They also satisfy the statutory requirement that they be specific.

(1970); *In re: Nomination Petition of Silverman*, 89 Dauph. 59 (1968); *Horton Petition*, 11 [Pa.] D & C.2d 706 (1957). *See also Chalfin v. Specter*, 426 Pa. 464, 233 A.2d 562 (1967). The fact that this Court has not specifically addressed the justiciability issue in its cases involving challenges under the Election Code does not support a finding that such challenges are not justiciable. Indeed, our heretofore uniform practice of dealing with these cases on the merits and the absence of any legislative action in response argues for justiciability. Moreover, the justiciability issue was raised in the *Carlson* case and disposed of by the Commonwealth Court. We could not have affirmed the Commonwealth Court's decision if the matter was not justiciable.

The plurality relies on *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) and *Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969) in deciding the justiciability issue.[3] In both these cases, the United States Supreme Court explained the considerations involved in determining that a matter is justiciable in its generic sense of appropriate for judicial resolution and specifically, that it is not a "political question" properly left to a coordinate branch of the government under the doctrine of separation of powers. In both cases the Court found the issues involved justiciable and did adjudicate them.

*Baker* and *Powell* articulated a practical standard for determining whether a case or controversy involves a nonjusticiable political question. The Supreme Court concluded that a nonjusticiable political question implicates at least one of the following factors:

a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of

**3.** The opinion in support of the Court's orders is confusing in its use of these cases. It seems to use them indiscriminately to support: its holding of non-justiciability under the Election Code; its later holding that judicial enforcement of Ms. Jones's right to be on the ballot is justiciable; and its dictum that matters involving the Senate's Article II, Section 9 power "to judge of the election and qualifications of its members" is the subject both of concurrent jurisdiction and judicial review. On the last issue see Part III of this dissent.

judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion, or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr,* 369 U.S. at 217, 82 S.Ct. at 710, quoted in *Powell v. McCormack,* 395 U.S. at 518–19, 89 S.Ct. at 1962. Analysis of the present case under that standard shows that the challenge to candidate Jones's nominating petition was not a political question.

Article II, Section 9, of our Constitution is not a textually demonstrable constitutional commitment of the issue of a "candidate's" constitutional qualifications to the legislature; it is only a textual commitment of authority for the legislature to determine qualifications of its "members." *See In re Carlson, supra.*

In *Powell v. McCormack, supra,* the United States Supreme Court held the exclusion of a person elected to the national House of Representatives by that body was reviewable by the judiciary under Article III of the United States Constitution despite the text of that Constitution's Article I, Section 5, stating that each house shall "be the Judge of the Elections, *Returns* and Qualifications of its own members." Emphasis added. The analogous provision of our Constitution, Article II, Section 9, does not provide a broader commitment of authority to our legislature than Article I, Section 5 of the United States Constitution gives to Congress; in fact it is arguably narrower. It states in pertinent part: "Each House shall choose its other officers and shall judge of the election and qualifications of its members."

Moreover, in *Powell* the court specifically reserved the question of whether federal courts might be barred under

the political question doctrine from reviewing the House's factual determination that a member did not meet one of the constitutional qualifications. The *Powell* court did not use language, dicta or otherwise, that would suggest that the political question doctrine bars judicial review of a challenge to a "candidate's" constitutional qualifications. *See also Roudebush v. Hartke,* 405 U.S. 15, 92 S.Ct. 804, 31 L.Ed. 211 (1972) (state court's order of a recount in United States Senatorial race does not interfere with Senate's power under Article I, Section 5 of United States Constitution).

In *Baker v. Carr,* 369 U.S. at 211, 82 S.Ct. at 706, the United States Supreme Court pointed out:

deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution.

In recognition of that delicate balance, which is equally present under our Constitution, and to avoid any potential conflict between itself and the courts over challenges to qualifications of "members," our legislature enacted an Election Code which grants the judiciary the power to determine the "candidates' ", not "members' ", constitutional qualifications. By severely limiting the time, within which the court could exercise its jurisdiction to hear challenges to the constitutional qualifications of candidates for office, to seven days from the filing of a nominating petition or papers, a period well before either the primary or the general election, and by requiring the candidate's "affidavit," through which such challenges are made, the legislature has nicely preserved that balance.

The opinion in support of the Court's order declaring Ms. Jones's residency qualifications non-justiciable avoided our responsibility. That avoidance led to the "incredible scenario" of the present Senate's attempt to control the seating of

a potential future member and the stand-off between the Secretary of the Commonwealth and the Philadelphia Board of Elections. That scenario brought this Court back into the assertedly non-justiciable matter to order Ms. Jones's certification as a candidate without permitting either the judiciary, the executive or the Senate to determine whether she met the constitutional requirement of one year's prior residency in her District, a condition precedent to her seating if elected.

When applied to this case the remaining factors in the *Baker-Powell* standard also support a finding that the question before us is a -justiciable question. There are judicially discoverable and manageable standards to aid in the resolution of a factual challenge to the constitutional qualifications the legislature has required a candidate to state in her affidavit. In fact, the legislature prescribed a complete framework for the judiciary to follow in entertaining such challenges when it enacted the Election Code.

Our courts are quite capable of resolving factual questions such as whether a candidate meets the age and residency requirements of our Constitution without an initial policy determination of any sort. Moreover, our resolution of a challenge to a candidate's qualifications expresses no lack of respect for a coordinate branch of government. The Election Code sets forth the legislative mandate directing the courts to resolve such questions when properly raised. We are more likely to invite disrespect by refusing to follow its direction, absent a valid constitutional ground. The opinion supporting the Court's orders itself correctly recognizes that the legislature has no power to consider a candidate's qualifications before election. This recognition necessarily implies the absence of any potential embarrassment arising out of "multifarious pronouncements by various departments on one question."

Finally, my reading of the nineteen cases cited in at 58–61 of the opinion supporting the orders of the Court for the proposition that courts do not have "jurisdiction" to intervene "at this juncture", *id.* at p. 58, indicates to me

that eighteen of them deal with post-general election challenges under an election code and only one, *Covington v. Buffett,* 90 Md. 569, 45 A. 204 (1900) deals with a post-primary, pre-general election. I cannot discern the relevance of these cases to the Election Code matter before us.

## III

Perhaps the most troubling aspect of the opinion supporting these orders is its unnecessary attempt to deal with jurisdiction and justiciability of issues surrounding the seating or expulsion of an elected candidate. *See* at 61–63 of the opinion supporting the orders of the Court, and cases cited thereat. The question of whether an elected candidate should be seated is simply not before us. The issue here is whether a candidate's nominating petition is defective if she falsely states she meets constitutional requirements for holding office. That issue is traditionally justiciable. The question of whether an elected candidate should not be seated for failure to meet constitutional qualifications does implicate an issue for which there is arguably a plain textual commitment of authority to a legislative body. Resolution of the justiciability question is not before us in that context where it unarguably "requires a most delicate exercise in constitutional interpretation." *Baker v. Carr,* 369 U.S. at 211, 82 S.Ct. at 706, quoted with approval in *Powell v. McCormack,* 395 U.S. at 521, 89 S.Ct. at 1963. We should not engage in any constitutionally delicate exercise on a question not before us.

As stated in Part II of this dissent, *Powell v. McCormack* carefully noted that the issue there before the Court was only Mr. Powell's request for a declaratory judgment that the House before seating him could not require him to meet qualifications beyond those specified in the Constitution. After analyzing the historical evidence the *Powell* court held only that the national House could not refuse to seat an elected member who met the constitutional requirements for seating. It did not hold that the judiciary had any power over a refusal to seat a person if the House deter-

mined he had failed to meet constitutional requirements. The United States Supreme Court also carefully noted that the power to expel a seated member was nowhere involved.

Broad assertions of jurisdiction over the seating of elected members of the legislature by the common law writs of mandamus or *quo warranto* are unnecessary and inconsistent with this Court's timid reluctance to involve itself in pre-election issues of a candidate's right to run for the office of State Senator. *See Harrington v. Carroll,* 428 Pa. 510, 239 A.2d 437 (1968). They raise issues of both jurisdiction and justiciability that we should be most reluctant to deal with. None of the cases cited in the opinion in support of the Court's orders holds justiciable the issue of whether an elected candidate, unlike one seeking to run, should be refused his seat for failure to meet constitutional qualifications.

The dictum, implying that the judiciary would be less "directly involved in evaluating constitutional qualifications" if it were to review the Senate's decision on a post-election seating contest than if it were to vacate an unqualified candidate's nomination petition under the express provisions of the Election Code, is incomprehensible to me. The consideration of the candidate's qualifications in the seating case is no more "tangential" to judicial decision than in the Election Code case.

Moreover, the Constitution plainly entrusts the Senate itself with responsibility for preserving its own "integrity as a public institution" by seating elected members who are constitutionally qualified and refusing seats to those who are not. No statute has entrusted this determination to the judiciary. In contrast, the General Assembly, has directed the judiciary in Section 977 of the Election Code to preserve the integrity of elections by vacating nomination petitions filed by candidates who falsely swear they meet constitutional requirements to serve. We should have followed the heretofore unbroken precedent in this jurisdiction, affirmed Judge Rogers's constitutional assertion of jurisdiction over

the "merely tangential" constitutional issue and considered Ms. Jones's appeal on the merits.

## IV

In sum, the judiciary has a duty to determine the constitutional qualifications of candidates for the offices they seek; that duty does not conflict with the Senate's constitutional power to determine the election and qualifications of its members. The legislature not only recognized that duty but expressly requested us to perform it. Its performance is not foreign to our experience and has involved us in no great difficulties. The Objectors properly raised the issue of Ms. Jones's residence and Judge Rogers properly considered it. We should have reviewed his decision on its merits. As a result of our failure to do so the issue of whether Roxanne Jones can constitutionally serve remains undetermined and its determination is unnecessarily entrusted to a political branch whose decisions are routinely and properly based on the majorities of the moment,[4] to whom it is largely responsible. The essence of a constitution is the insulation of its commands from that type of determination wherever possible. The institution which is charged with providing that insulation is the judiciary. Ideally, we proceed on reason to which we are largely responsible and our decisions on the constitution, within the limits of our own constitutional power, thus gain an acceptance which constitutional decisions of the more political branches do not have. I cannot avoid the belief that this Court's decision not to review Judge Rogers's determination of Ms. Jones's constitutionally required residential connec-

---

4. Moreover, by leaving the very serious challenge to the qualifications of candidate Jones unresolved until after the general election, the opinion supporting the orders of the court creates an unnecessary likelihood of a special election should Ms. Jones win the general election and the Senate determine that she is not qualified under Article II, Section 5. Such special elections are sometimes necessary but never desirable. They frequently leave the residents of a district unrepresented for substantial periods of time. They require constitutionally qualified candidates to face a second campaign, a costly and demanding process, as a result of a constitutionally unqualified candidate's participation in the first election.

tion with her prospective constituents is wrong, and the reasoning the plurality advances to support it is fallacious and internally inconsistent.

McDERMOTT, J., joins in this opinion.