Roger BUEHL, Craig Williams, Mumia Abu–Jamal, and Donald Tedford, Petitioners,

v.

Martin HORN, Commission, Pennsylvania Department of Corrections, and James Price, Superintendent, State Correctional Institution-Greene, and Ken Miller, G–Unit Manager, State Correctional Institution-Greene, Respondents.

Commonwealth Court of Pennsylvania.

Decided Feb. 3, 1999.

Publication Ordered April 22, 1999.

---

Robert A. Preate and Christopher J. Preate, Scranton, for petitioners.

Jill C. Fluck, Camp Hill, for respondents.

DOYLE, Judge.

Before this Court in our original jurisdiction are the preliminary objections of Martin Horn in his capacity as Commissioner of the Department of Corrections, James Price, Superintendent of the State Correctional Institution at Greene (SCI–Greene), and Ken Miller, G–Unit Manager at SCI–Greene, (collectively, DOC) to a petition for review filed by Roger Buehl and three other capital-case inmates [1] (collectively, Petitioners) incarcerated in the G–Unit at SCI–Greene, as well as the preliminary objections of Petitioners to DOC's preliminary objections and a suggestion of mootness filed by DOC. The petition for review challenges several aspects of the conditions of SCI–Greene, specifically, the exercise time allotted to capital case inmates, all of whom are housed in the G–Unit at SCI–Greene.[2]

The lengthy procedural history of this case is summarized as follows. The case originated on August 28, 1996, when Buehl and the other capital case inmates housed on G–Unit at SCI–Greene filed a petition for review challenging DOC's decision to remove typewriters from the G–Unit law library. The inmates alleged that DOC's removal of the typewriters restricted their access to the courts, violated their right to equal protection under the law and was otherwise carried out in retaliation for a lawsuit which they had filed in federal district court which had also sought review of some of the practices and conditions at SCI–Greene.[3] In addition, the

inmates also averred that, pursuant to Section 1 of the Act of June 14, 1923, P.L. 775, *as amended,* 61 P.S. § 101 (Section 101), they were entitled to two hours of exercise each day and that DOC was only permitting them one hour of daily exercise. Section 101 provides as follows:

> Every warden, board of prison managers, prison inspectors, or any other person in authority, in charge of any prison or penitentiary, who may or shall have in charge any person confined therein whether such person be a tried or an untried prisoner, shall provide that such person shall have at least two hours daily, physical exercise in the open, weather permitting, and upon such days on which the weather is inclement, such person shall have two hours, daily, of physical exercise indoors of such prison or penitentiary: Provided, however, The same is safe and practical, and the judges of the several courts are to be the judges thereof. **Prisoners in segregation or disciplinary status shall receive a minimum of at least one hour of daily exercise five days per week.**

61 P.S. § 101 (emphasis added).

In response, DOC filed preliminary objections in the nature of a demurrer as to the typewriter claim and asserted that Petitioners did not allege a constitutional or statutory violation as to the exercise claim. In addition, DOC asserted that the exercise issues presented in the federal litigation in *White v. Williams* involved the same parties, the same issues and relief and argued that this Court should either stay or completely dismiss the exercise claim in the petition for review filed with this Court based upon the doctrine of *lis pendens.*

On August 22, 1997, this Court issued an unreported decision and order sustaining

---

1. The four petitioners are Roger Buehl, Craig Williams, Mumia Abu–Jamal and Donald Tedford.

2. During these proceedings, the Court was informed that, at one time, there were 111 death-row inmates at SCI–Greene, but that now there are approximately 100. (Notes of Testimony, 10/27/98, at 47.)

3. Prior to filing the petition for review in this Court, the inmates had filed a civil rights action

in the Federal District Court for the Western District of Pennsylvania, captioned *White v. Williams* (No. 95–338), alleging in part that DOC provided capital-case inmates at other state correctional institutions two hours of exercise daily, whereas Petitioners only received one hour of daily exercise. This policy, they alleged, violated their right to equal protection of the law under the federal constitution.

DOC's preliminary objection as to the access to courts claim, finding that the restrictions on access to the typewriters did not affect Petitioners' access to the Courts. In addition, we sustained DOC's preliminary objection regarding the pending federal litigation and dismissed that claim based upon the litigation in Western District Federal Court. No petition for allowance of an interlocutory appeal was perfected from that decision.[4]

On November 25, 1997, the Honorable Alan N. Bloch of the United States District Court for the Western District of Pennsylvania granted summary judgment in favor of the Commonwealth defendants on the inmates' exercise claim based on equal protection grounds, thereby dismissing the federal constitutional claim.

Following the resolution of several ancillary disputes between the parties, on September 18, 1998, Petitioners filed an application to lift the *lis pendens* and reinstate the original exercise claim. In addition, Petitioners sought leave of this Court to amend their original petition for review to include a claim that DOC failed to supply adequate footwear with which Buehl and the other inmates could exercise (hereinafter, the "sneaker issue"). The crux of the sneaker issue was that DOC did not provide adequate sizes of footwear to each inmate such that they could effectively utilize their exercise time.[5]

On September 21, 1998, DOC filed an answer to the application, again asserting that Petitioners failed to state a claim upon which relief could be granted and asserting that Buehl and the other petitioners were "segregated," as that term is used in 61 P.S. § 101. Therefore, DOC argued that the Court should sustain its original demurrer and dismiss the petition for review, rather than permit Petitioners to reinstate the exercise claim. In addition, DOC filed a suggestion of mootness, averring that it had placed four functional typewriters in the G–Unit law library, and, therefore, that issue was moot. Shortly thereafter, Petitioners filed preliminary objections to DOC's original preliminary objections. Specifically, Petitioners sought to strike DOC's objections on the basis that, Petitioners argued, in its answer to the application to lift the *lis pendens*, DOC had further expanded on its original demurrer and inserted facts not of record into the pleading such that it constituted a "speaking demurrer" in violation of Pa. R.C.P. No. 1028(a)(2). In addition, Petitioners filed an answer to DOC's suggestion of mootness, alleging that, although there were several functional typewriters in the G–Unit law library, several corrections officers were locking Petitioners in the library and not permitting them to leave, even if they had to go to the bathroom.

To summarize, the following motions/applications and cross-motions/applications are currently pending before the Court: (1) Petitioners' application to lift the *lis pendens* and DOC's response thereto; (2) DOC's preliminary objections; (3) Petitioners' preliminary objections to DOC's preliminary objections; and (4) DOC's suggestion of mootness and Petitioners' response thereto.

We will first address the issue of *lis pendens*, because, if we decline to lift the *lis pendens* and resurrect the underlying claims, all the other pending issues, aside from the typewriter issue, would be eliminated.

■ It is a well-settled principle of law in the Commonwealth that a trial court, which is the capacity in which this Court now is functioning in its original jurisdiction, can issue two types of orders, final and interlocutory. Pursuant to Pennsylvania Rule of Appellate Procedure 341, a "final order" is any order that:

(1) disposes of all claims and of all parties, or

(2) any order that is expressly defined as a final order by statute; or

4. Petitioners filed a motion to certify an interlocutory order on September 25, 1997, which was denied as untimely by a September 30, 1997 order of this Court.

5. More specifically, the parties agreed that, prior to March of 1998, inmates at SCI–Greene were permitted to purchase their own named-brand sneakers via mail-order catalogues. Following an escape at SCI–Pittsburgh, however, DOC required all capital case inmates to wear the same exercise footwear which counsel for DOC represented was a type of boat shoe which has no laces, but slips on the inmate's foot.

(3) any order entered as a final order pursuant to subdivision (c) of this rule.

Pa. R.A.P. 341. Conversely, a interlocutory order is an interim order which does not end the litigation, but only disposes of an intermediate aspect of it.[6] There is a significant difference between a final order and an interlocutory one as it relates to the ability of a trial court to amend an order. Pursuant to Section 5505 of the Judicial Code, 42 Pa.C.S. § 5505, a trial court may amend an order within 30 days of its entry. As the Superior Court noted, however, such a rule applies only to final orders of a trial court, not to interlocutory orders. *See Commonwealth v. Nicodemus,* 431 Pa.Super. 342, 636 A.2d 1118 (1993), *petition for allowance of appeal denied,* 540 Pa. 580, 655 A.2d 512 (1994). Therefore, it follows that a trial court does have the authority, even after the expiration of 30 days, to modify an interlocutory order

 At a hearing held on October 27, 1998, to discuss the remaining legal issues of this case, counsel for DOC, Raymond Dorian, Esquire, conceded on the record that the order granting the *lis pendens* was an interlocutory order and further conceded that the Court does have the power to vacate that portion of the August 22, 1997 order which dismissed the exercise claim, if it chooses to do so. Mr. Dorian argued, however, based on policy grounds, such as the need for finality in the litigation and DOC's reliance on the August 22, 1997 order, that this Court should not vacate the order. We have considered the offered reasons for not vacating the August 22, 1997 order as it relates to the exercise claim, and, although we agree with DOC that this litigation must end at some point in time, we will nonetheless vacate that portion of the order which dismissed Petitioners' statutory exercise claim and resurrect that claim.

We now turn to the preliminary objections of the parties.

 Petitioners have filed preliminary objections to the original preliminary objections, making two specific objections. First, Petitioners argue that the original demurrer filed by DOC was insufficiently vague in violation of Pa. R.C.P. No. 1028(b).[7] Second, Petitioners argue that, in its answer to the application to lift the *lis pendens,* DOC essentially added new facts to its original demurrer, facts which were not of record, such that DOC improperly amended it's original demurrer and created a "speaking demurrer" in violation of Pa. R.C.P. No. 1028(a)(2) (failure to conform to the rules of court). After reviewing the documents submitted by both parties, we have concluded that DOC's preliminary objections are legally adequate, and we will, therefore, deny the Petitioners' preliminary objection to that objection.[8] Specifically, we believe that the general demurrer filed by DOC alleging that Petitioners have failed to state a cause of action based upon a statutory violation was sufficient as a matter of law. In addition, DOC's purported "speaking demurrer" merely contains legal conclusions and opinions in it, and it does not appear to us to attempt to interpolate facts not of record into the record.[9] Accordingly,

---

6. The official note accompanying Pa. R.A.P. 341 identifies one type of interlocutory order as one "dismissing one of several causes of action pleaded in a complaint but leaving pending other causes of action." Note to Pa. R.A.P. 341.

7. That rule provides in relevant part as follows:
 All preliminary objections shall be raised at one time. They shall state specifically the grounds relied upon and may be inconsistent. Two or more preliminary objections may be raised in one pleading.
 Pa. R.C.P. No. 1028(b).

8. Furthermore, we note that Pa. R.C.P. No. 1026 requires that, after the complaint is filed, subsequent pleadings are required to be filed within 20 days of the filing of the previous pleading. DOC filed its original demurrer on February 10, 1997, and Buehl filed his lack of specificity objection on October 9, 1998, nearly one year and eight months later. Therefore, this objection was untimely.

9. Specifically, what Petitioners complain of in their preliminary objections is DOC's conclusion that "the capital case inmates ... are clearly in segregated housing and not in general population. Therefore, the one hour minimum exercise requirement applies to them." (DOC's Answer to Lift Lis Pendens and Reinstate Exercise Claim and to Modify Exercise Claim at 2.) As noted above, this is nothing more than legal argument and opinion, not extraneous facts. Moreover, we note that, at the October 27, 1998 hearing, Buehl's counsel stipulated on the record that the Petitioners, as death-row inmates, are not permitted to mingle with the general population.

we will deny Petitioners' preliminary objection in this respect as well.

We now address DOC's demurrer alleging that Petitioners have failed to state a claim upon which relief can be granted. In ruling on a demurrer, we must accept all well-pled facts as true to determine whether Petitioners could still receive the relief that they seek. *Stewart v. Pennsylvania Board of Probation & Parole,* 714 A.2d 502 (Pa. Cmwlth.1998). The demurrer and the attending arguments present us with an issue of first impression for Pennsylvania Courts, whether capital case inmates are "in segregation," as that term is used in 61 P.S. § 101 and, thus are not entitled to "at least two hours of daily, physical exercise" to which the general prison population is entitled. The essential part of Section 101 which we must construe states:

**Prisoners in segregation or disciplinary status shall receive a minimum of at least one hour of daily exercise five days per week.**

61 P.S. § 101 (emphasis added). This sentence was singularly added in 1990 by the Act of December 7, 1990, P.L. 617.

The manner in which courts of this Commonwealth must interpret acts of the General Assembly is well settled. The Statutory Construction Act of 1972 provides, in relevant part, as follows:

(a) The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions.

(b) When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.

(c) When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters:

(1) The occasion and necessity for the statute.

(2) The circumstances under which it was enacted.

. . . .

(5) The former law, if any, including other statutes upon the same or similar subjects.

. . . .

(8) Legislative and administrative interpretations of such statute.

1 Pa.C.S. § 1921. As noted above, the goal of statutory interpretation is to ascertain and effectuate the intent of the General Assembly. *Meier v. Maleski,* 670 A.2d 755 (Pa. Cmwlth.1996), *aff'd,* 549 Pa. 171, 700 A.2d 1262 (1997).

Our first inquiry, then, is to determine whether the phrase "in segregation" is ambiguous or otherwise unclear. If the language is clear, then we must apply the plain meaning of the statute, and our inquiry ends. *Meier.* If the language is unclear, we must look to the above factors to discern the intention of the General Assembly. *Id.*

In support of its demurrer, DOC first argues that the language of the amendment is clear and unambiguous. Specifically, DOC notes that, by its dictionary definition, an individual is segregated if he is kept apart or not permitted to associate with another group. Moreover, DOC notes that the complete phrase in the amended statute is "in segregation or disciplinary status." Accordingly, DOC argues that it is reasonable to infer that "in segregation" refers to a status whereby an inmate is kept apart from the general prison population for reasons other than disciplinary infractions. Specifically, DOC points out that, in its Department Policies, the term "administrative custody" is defined as "[a] status of confinement for *non-disciplinary* reasons which provides for closer supervision, control, and protection than is provided for in general population." (DC–ADM 802.) (Emphasis added.) Pursuant to that same policy, Phase I capital case inmates are placed in administrative custody. Therefore, DOC argues, the plain meaning of the phrase "in segregation" refers to inmates who are segregated from the general population for non-disciplinary reasons, including those in administrative custody. At the October 27, 1998 hearing, Petitioners' counsel stipulated that his clients, as capital case inmates, are not permitted to mingle or oth-

erwise interact with the general population of the prison. Therefore, DOC argues, under the plain meaning of the statute, Petitioners are in segregation, and, as a result are entitled to only one hour of daily exercise, and there is no need to ascertain the legislative intent behind the 1990 amendment or the phrase "in segregation."

Alternatively, if the phrase "in segregation" is ambiguous, DOC argues that the amendment to Section 101 in 1990 can be seen as a legislative response to several decisions of this Court, the final one occurring less than a year prior to the amendment.

In *Inmates of B–Block v. Jeffes*, 79 Pa. Cmwlth. 275, 470 A.2d 176 (1983), *aff'd*, 504 Pa. 509, 475 A.2d 743 (1984), this Court examined the pre–1990 version of Section 101. In *Jeffes*, several inmates of the Restrictive Housing Unit of the State Correctional Institution at Huntingdon filed an application for mandamus, alleging that they were entitled to the statutory two hours of daily exercise. In issuing a writ of mandamus, we held that

> We construe Section 1 of the Act to impose an affirmative duty on the prison officials to provide two hours of daily physical exercise. . . .

*Jeffes*, 470 A.2d at 180 (citation omitted). This view of Section 101 was followed in several cases, culminating in *Shoats v. Owen*, 128 Pa.Cmwlth. 427, 563 A.2d 963 (1989), in which the Court reaffirmed that DOC had a duty to provide *all* inmates, regardless of whether they were in a restricted housing unit or in the general population, with two hours of exercise. The Court determined that, on days when it was not feasible for inmates to have outdoor exercise, DOC was not required to provide inmates in restricted housing units with alternative indoor exercise due to security concerns.

DOC asserts that, if "in segregation" is an ambiguous term, the amendment of Section 101 should be viewed as a legislative response to the line of cases including *Jeffes* and *Shoats*.

In response, Petitioners argue that the phrase "in segregation" is ambiguous, and we must discern the legislative intent of the General Assembly in amending Section 101.

Petitioners argue that, when the General Assembly amended Section 101 and included the term "segregation," it was cognizant of other sections of Title 61 which utilized and authorized segregation of prisoners. Specifically, Petitioners point us to Sections 2, 3 and 4 of the Act of May 10, 1921, *as amended*, 61 P.S. §§ 2–4, (Sections 2, 3 and 4) which, although in effect at the time of the 1990 amendment to Section 101, were repealed in 1992 by the Act of December 14, 1992, P.L. 887, and provided as follows:

> Section 2: All prisoners whose physical condition is not considered good, or who are suffering from any disease, shall be segregated from the prisoners who are or who are considered to be in good physical condition.

> Section 3: All prisoners who are found to be mentally weak shall be segregated from the other prisoners and not allowed to be among or mingle with those whose mentality is found to be normal.

> Section 4: All prisoners who are found or considered to be habitual criminals, or are found to be evil-inclined, shall be segregated, and not allowed to be among or mingle with those of opposite inclinations.

61 P.S. §§ 2–4. Petitioners argue that, at the time of the amendment to Section 101, the General Assembly understood the concepts of segregation contained in the above sections and incorporated them into the phrase "in segregation" in Section 101. Therefore, "segregation" in Section 101, Petitioners argue, encompasses only that segregation authorized by Sections 2 to 4, *i.e.*, segregation because of physical illness or mental weakness. In addition, Petitioners assert that because Sections 2, 3 and 4 and Section 101 deal with similar topics, *i.e.*, the segregation of prisoners, we, therefore, must read statutes *in pari materia*. We do not agree.

At the outset, we believe that DOC correctly argues that the plain meaning of the phrase "in segregation" denotes a status of being kept apart from the general population. Reading it within the context of the statute, *i.e.*, "in segregation or disciplinary status," we believe that "in segregation" means separation from the general popula-

tion for reasons other than disciplinary reasons, *i.e.*, administrative custody. Accordingly, as the parties have stipulated that Petitioners, and all death row inmates, are not permitted to mingle or associate with the general population of the institution, we believe that Petitioners are "in segregation" for purposes of the amendment.

Moreover, assuming arguendo that the phrase "in segregation" is ambiguous, although we agree with Petitioners that "in segregation" refers to segregation for reasons other than disciplinary infractions, we cannot agree with Petitioners' construction of the phrase to include *only* those inmates with physical or mental infirmities. It is an elementary principle of statutory construction that this Court must presume that the General Assembly did not intend an absurd result and intended that all aspects of the legislation will be given effect. *See* 1 Pa.C.S. § 1922. Turning to Petitioners' construction of 61 P.S. § 101, we do not believe that the General Assembly, by amending Section 101, intended to limit the exercise time of inmates who are not physically or mentally capable of being housed with the general population. It seems absurd and illogical that the General Assembly would seek to limit the exercise of those inmates who, due to physical or mental infirmity, may not be capable of **any** exercise. Accordingly, we do not believe that the General Assembly intended that these types of prisoners, *i.e.*, those formerly dealt with in Sections 2, 3 and 4, would be the only inmates excluded from the general population for reasons other than disciplinary infractions, and accordingly, we reject Petitioners' narrow construction of Section 101.

■ Likewise, we reject Petitioners' argument that the statutes must be read *in pari materia*. In order for a Court to read statutes together, it must be established that the statutes relate to the same thing or the same class of people. *See* 1 Pa.C.S. § 1932; *Muntz v. Department of Transportation*, 674 A.2d 328 (Pa.Cmwlth.1996), *rev'd on other grounds sub nom.*, *Cellucci v. General Motors Corp.*, 550 Pa. 407, 706 A.2d 806 (1998). In the present case, we do not believe that Sections 2, 3 and 4 and Section 101 relate to the same thing or same class of people. It is

clear that the subject matter of the statutes is dissimilar. Sections 2, 3 and 4 relate to the segregation of inmates based upon mental or physical concerns. Section 101 deals exclusively with the amount of exercise that DOC is required to provide to all inmates. Because of this difference, we do not believe that the statutes can be read *in pari materia*, and we reject Petitioners' argument in this respect.

■ Furthermore, if Petitioners are correct in their assertion that the phrase "in segregation" is ambiguous, we must agree with DOC that the 1990 amendment to Section 101 represented a legislative response to the line of cases involving the required amount of daily exercise due to inmates, specifically those separated from the general population. The General Assembly is presumed to concur with the interpretation placed upon a statute if it does not amend the statute within a reasonable time. *See Northeastern Building Registered v. Commonwealth*, 41 Pa.Cmwlth. 403, 399 A.2d 449 (1979). Indeed, the General Assembly has acted on several previous occasions to amend statutes and legislatively overrule decisions of the judiciary. *See Commonwealth v. State Conference of State Police Lodges of the Fraternal Order of Police*, 525 Pa. 40, 575 A.2d 94 (1990), *superseded by statute*, 71 Pa.C.S. § 5955; *Neshaminy Federation of Teachers v. Neshaminy School District*, 501 Pa. 534, 462 A.2d 629 (1983), *superseded by statute*, Act of June 29, 1984, P.L. 438, *as amended*, 24 P.S. § 11–1133. Accordingly, to the extent that the amendment to Section 101 is ambiguous, we believe that the General Assembly amended the statute in response to *Jeffes* and *Shoats*.

■ Petitioners next argue that permitting only one hour of exercise to capital case inmates would violate the prohibition against ex post facto laws. But, it is a well-settled principle of law within the Commonwealth that, if a plaintiff fails to properly plead a separate cause of action, the cause of action which he did not plead is waived. *Estate of Swift v. Northeastern Hospital of Philadelphia*, 456 Pa.Super. 330, 690 A.2d 719, *petition for allowance of appeal denied*, 549 Pa. 716, 701 A.2d 577 (1997). In the

present case, Petitioners not only did not plead an ex post facto violation in their original petition for review to this Court, but only raised it for the first time in their brief to this Court following the October 27, 1998 hearing. Petitioners, therefore, have waived this count of their complaint.

Accordingly, we now hold that capital-case inmates are "in segregation" for purposes of 61 P.S. § 101, and, therefore, DOC has a statutory duty to provide them with "one hour of daily exercise five days per week." Because of our conclusion that Petitioners are only entitled to one hour of daily exercise,[10] we will sustain DOC's demurrer and dismiss the exercise claim with prejudice. In addition, at the October 27, 1998 hearing, counsel for Petitioners conceded that the sneaker issue was inseparably tied to the exercise claim, such that if we ruled against Petitioners on the statutory exercise claim, they could not amend the petition for review to include the sneaker claim. Based upon our disposition of the statutory claim, we deny Petitioners' application to amend the initial petition for review to include such a claim.

■ The remaining legal issue is whether to grant DOC's suggestion of mootness as a result of DOC's representation to the Court that four working typewriters are in the G–Unit law library, as well as its assertion that it has no legal duty to provide Petitioners with any typewriters. At the October 27, 1998 hearing, counsel for Petitioners represented to the Court that the typewriters in the G–Unit law library are not functional. Therefore, there appears to still remain a case or controversy such that this Court cannot grant DOC's suggestion of mootness. *Lincoln Party by Robinson v. General Assembly,* 682 A.2d 1326 (Pa.Cmwlth.1996). Although we cannot grant DOC's suggestion

of mootness, we note that our Supreme Court's recent decision in *Bronson v. Central Office Review Committee,* 554 Pa. 317, 721 A.2d 357 (1998) may be instructive on the remaining legal issues involving the typewriters. However, as neither party presently has a motion for summary relief pending before the Court on the typewriter issue, we cannot further examine *Bronson's* applicability to the present case.

### ORDER

NOW, February 3, 1999, Petitioners' application to lift the lis pendens is granted, Petitioners' Preliminary Objections to the Department of Corrections' Preliminary Objections are overruled, the Department of Corrections' Preliminary Objections are sustained, and the statutory exercise claim in the Petition for Review is dismissed with prejudice. The Suggestion of Mootness filed by the Department of Corrections is denied.

---

**10.** At the October 27, 1998 hearing, counsel for Petitioner placed great emphasis on the fact that capital-case inmates at other state correctional institutions were receiving more than one hour of daily exercise. Our response to that is twofold. First, Petitioners' claim is grounded exclusively in Pennsylvania statutory law, not in equal protection. Therefore, whether DOC permitted other capital-case inmates at different institutions more exercise is irrelevant to the amount of statutorily required exercise Petitioners are to

receive. Second, our holding today does not preclude DOC from permitting capital-case inmates at other institutions from having more than one hour of daily exercise if it so desires, nor does it preclude DOC from limiting the amount of exercise capital-case inmates at other institutions receive to one hour. Section 101 uses the phrase "at least" before its provision for both one hour and two hours of daily exercise. Today's ruling does not establish a ceiling for daily exercise, only a floor.