**[J-39-2022] [MO: Wecht, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| IN RE: NOMINATION PETITION OF ROBERT JORDAN AS REPUBLICAN CANDIDATE FOR STATE REPRESENTATIVE FROM THE 165TH LEGISLATIVE DISTRICT | : : : : : : | No. 56 MAP 2022<br><br>Appeal from the Order of the Commonwealth Court at No. 187 MD 2022 dated April 11, 2022. |
| | : : | SUBMITTED: April 16, 2022 |
| APPEAL OF: FRED RUNGE, | : : | |
| Objector | : | |

**DISSENTING OPINION**

**JUSTICE BROBSON**

DECIDED: April 19, 2022
OPINION FILED: July 20, 2022

I prefer the plurality's analysis over that of Justice Hutchinson's dissent in *Nomination Petition of Jones*, 476 A.2d 1287 (Pa. 1984). More importantly, however, subsequent legislative action clearly evinces the General Assembly's intent to reserve unto the respective Houses of the General Assembly the exclusive authority to enforce the constitutional residency requirements applicable to their members. For these reasons, I dissented from the April 19, 2022 *per curiam* Order, reversing the Commonwealth Court's decision in this matter.

*Jones* involved challenges to the nomination petitions of Roxanne H. Jones (Jones), who filed to seek the Democratic Party's nomination for a seat in the Pennsylvania Senate. The objectors, which included the Democrat incumbent, sought to challenge Jones' petitions on the ground that *if* she prevailed, the Pennsylvania Senate *"might* refuse to seat her," as the objectors claimed that Jones could not satisfy the one-year residency requirement in Article II, section 5 of the Pennsylvania Constitution. *Jones*, 476 A.2d at 1289 (emphasis in original). The Commonwealth Court sustained the

challenge, concluding that Jones, if elected, could not meet the constitutional residency requirement applicable to state senators. In separate *per curiam* orders, this Court[1] reversed, holding that the objectors failed to establish a valid challenge to Jones' candidacy under the Pennsylvania Election Code (Election Code).[2] Justices McDermott and Hutchinson noted their dissents, because the petition seeking to set aside Jones' nomination petitions "expressly relied on Section 977 of the Election Code." *Jones*, 476 A.2d at 1288. Section 977 of the Election Code[3] provided then, as it does today, that a court must set aside challenged nomination petitions if*, inter alia*, the court determines that the nomination petition "was not filed by *persons entitled to file* the same." (Emphasis added.)

Chief Justice Nix later authored a plurality opinion in support of the Court's *per curiam* orders.[4] The plurality first observed that Section 977 of the Election Code provides the sole and exclusive remedy for challenging nomination petitions or papers of a person seeking elective office. *Id.* at 1294. The plurality found, however, that the objectors in *Jones* presented their residency qualification challenge as a constitutional challenge, not "in the specific terms of [S]ection 977." *Id.* at 1295. The plurality expounded further that the constitutional residency challenge was "not in any way related to an objection to the nomination petition under that section." *Id.* In other words, to the plurality, Section 977 did

---

[1] Of the six justices participating, only Justices McDermott and Hutchinson dissented.

[2] Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. §§ 2600-3591.

[3] 25 P.S. § 2937.

[4] Justice Flaherty did not join the Chief Justice's opinion, noting his concurrence without writing separately. Justice Hutchinson wrote a dissenting opinion, in which Justice McDermott joined. Justice McDermott wrote a brief dissenting opinion, in which Justice Hutchinson joined. What we have then, with *Jones*, is a majority result—reversal—with a plurality opinion in support and two minority opinions in dissent.

not (and does not) confer jurisdiction on the courts to enforce the Article II, section 5 residency requirement on would-be candidates.

In the principal dissenting opinion, Justice Hutchinson, by contrast, took a much broader view of the courts' authority under Section 977 of the Election Code. First, Justice Hutchinson rejected the plurality's view that the objectors failed to present their challenge in terms of Section 977 of the Election Code, noting that the first paragraph of their petition to set aside the nomination petitions expressly cited to Section 977. *Id.* at 1299 (Hutchinson, J., dissenting). Next, referring specifically to the language of Section 977, Justice Hutchinson noted that "[a] person who cannot serve is not entitled to file." *Id.* Justice Hutchinson bolstered his reasoning by citing to Section 910 of the Election Code,[5] which then (as it does now) required a person to attest on his or her candidate affidavit that he or she, *inter alia*, is "eligible" for the office sought. This statutory text, in Justice Hutchinson's view, evinced the General Assembly's intent to "entrust[] to the judiciary *a priori* determination of the presence of the impediment our Constitution's Article II, [s]ection 5, places against a non-resident's representing a Senatorial District." *Id.* at 1300.

In reply, the *Jones* plurality criticized Justice Hutchinson for attempting to recast the objectors' constitutional residency challenge to one of false swearing under Section 910 of the Election Code. *Id.* at 1295 (plurality opinion). The plurality further criticized Justice Hutchinson for equating "entitled to file" in Section 977 with "eligible for such office" in Section 910, characterizing it as an "extraordinary leap" to "assum[e] all of the laws of the Commonwealth, including Article 2, section 5, pertaining to qualifications for holding public office are incorporated into [S]ection 910." *Id.* at 1295-96. The plurality

---

[5] 25 P.S. § 2870.

opined: "[I]t does not necessarily follow that the legislature intended to use the election process as a device to screen against every possible impediment to holding office." *Id.* at 1295.

The obvious deficiency I see in Justice Hutchinson's dissent in *Jones*, aside from the fact that it garnered support from only two of the six justices who decided the matter, is that the Pennsylvania Constitution imposes no residency requirement on candidates who merely aspire to be members of the General Assembly and seek election thereto. Article II, section 5 of the Pennsylvania Constitution, titled "Qualifications of members," provides:

> *Senators* shall be at least [25] years of age and Representatives [21] years of age. *They* shall have been citizens and inhabitants of the State four years, and inhabitants of their respective districts one year next before their election (unless absent on the public business of the United States or of this State), and shall reside in their respective districts during their terms of service.

(Emphasis added.) Section 9 of the same article provides, in relevant part: "Each House shall . . . judge of the election and *qualifications of its members*." (Emphasis added.) In my view, this clear and unambiguous text imposes a residency requirement on *members* of the Senate and the House of Representatives, but not on candidates seeking to become members. Constitutional residency qualifications, then, are to be challenged and assessed against a member, not against a candidate (or potential candidate). Further, according to the Pennsylvania Constitution, such challenges must be lodged before the appropriate House of the General Assembly and not the courts.

Section 977 of the Election Code authorizes the courts, *inter alia*, to set aside nomination petitions or papers by "persons" who are "not . . . entitled to file the same." This provision is applicable to potential candidates for office, not current members of the General Assembly. The majority draws a clear distinction between candidates and

members when taking a narrow view of each House's constitutional power to judge the qualification only of its "members."[6]  Incongruously, like Justice Hutchinson's dissent in *Jones*, the majority broadly interprets the courts' authority under Section 977 to apply a constitutional *member* residency qualification to candidates.[7]  I believe the majority got it right the first time.  Members and candidates are different, at least when it comes to the application and enforcement of the constitutional residency qualification for members of the General Assembly.

I also respectfully disagree with the foundation of Justice Hutchinson's dissent in *Jones*, adopted by the majority here, that "[a]n individual who cannot meet the constitutional residency requirements . . . is not entitled to file a nomination petition."

---

[6] "Setting aside the General Assembly's constitutional responsibility for questions of *membership*, *candidate* eligibility cannot lie outside the judiciary's purview if the Constitution and the Election Code are to be applied impartially and with fidelity to their terms."  (Maj. Op. at 21 (emphasis in original).)

[7] Contrast the language of Article II, section 5 with the language in Article IV, section 5 of the Pennsylvania Constitution, relating to "Qualifications of Governor, Lieutenant Governor and Attorney General," which provides:

> *No person shall be eligible to the office* of Governor, Lieutenant Governor or Attorney General except a citizen of the United States, who shall have attained the age of 30 years, and have been seven years next preceding his election an inhabitant of this Commonwealth, unless he shall have been absent on the public business of the United States or of this Commonwealth.  No person shall be eligible to the office of Attorney General except a member of the bar of the Supreme Court of Pennsylvania.

(Emphasis added.)  Unlike the language in Article II, section 5, the age, residency, and bar membership eligibility requirements in Article IV, section 5 do not apply strictly to elected governors, lieutenant governors, or attorneys general; rather, the language can be read to apply more broadly to all "persons" and thus can arguably be applied to those persons who seek to become candidates for these offices but are constitutionally ineligible.  Similar broad language appears in Article II, section 7, titled "Ineligibility by criminal convictions": "*No person* hereafter convicted of embezzlement of public moneys, bribery, perjury or other infamous crime, *shall be eligible to* the General Assembly, or capable of holding any office of trust or profit in this Commonwealth."  (Emphasis added.)

(Maj. Op. at 21.) Instead, as the *Jones* plurality noted, there is no textual mooring to this statement, either in the Election Code or, more importantly, Article II of the Pennsylvania Constitution.[8] On matters involving the interpretation of constitutional provisions or statutes, the unambiguous text, not "time-honored principles of constitutional governance," (Maj. Op. at 20), informs my thinking. *See* 1 Pa. C.S. § 1921(b). Article II, section 5 imposes a residency requirement on members, not candidates. The Election Code does not impose any residency requirement on persons who file nomination petitions or papers. Accordingly, a nomination petition or paper challenge predicated on an allegation that a potential *candidate* does not meet a constitutional residency requirement applicable only to *members* cannot be sustained under Section 977 of the Election Code.

While neither the Pennsylvania Constitution nor the Election Code imposes a residency requirement on candidates or potential candidates, the Election Code contains several provisions that proscribe who is (and is not) "entitled" to file nomination petitions and nomination papers,[9] which can be enforced through a Section 977 challenge.

---

[8] The *Jones* plurality observed:

It is most significant that in spite of that dissent's liberal use of citations generally, not one case, not a scintilla of authority nor a prior decision is set forth to support this premise. To the contrary, it does not necessarily follow that the legislature intended to use the election process as a device to screen against every possible impediment to holding office.

*Jones*, 476 A.2d at 1295.

[9] The Election Code sorts political organizations into one of two categories—"political body" or "political party"—based on the percentage of the vote a political organization's candidate receives in the immediately preceding general or municipal election. Section 801 of the Election Code, 25 P.S. § 2831. Candidates of political parties are nominated through primary elections and must file nomination petitions to appear on the primary election ballot. Sections 902 and 907 of the Election Code, 25 P.S. §§ 2862, 2867. Political parties whose members account for less than 15% of the statewide registration across all political parties, however, are considered "minor" political parties.

To appear on a political party's primary ballot, a person must be "a duly registered and enrolled member of said party." Section 907 of the Election Code, 25 P.S. § 2867. For example, a registered Republican is not entitled to file nomination petitions to appear on the Democrat primary ballot. Under the Election Code's "anti-fusion" provision, a person can only seek to appear on the ballot for a single political party or body. Section 951(e)(5) of the Election Code, 25 P.S. § 2911(e)(5); *see generally Working Families Party v. Commonwealth*, 209 A.3d 270 (Pa. 2019) (rejecting constitutional challenges to anti-fusion provision in Election Code). Similarly, under the Election Code's "sore loser" provision, a person cannot file nomination papers "if the candidate . . . filed a nomination petition for any public office for the ensuing primary." Section 976 of the Election Code, 25 P.S. § 2936; *see generally In re Cohen for Office of Phila. City Council-at-Large*, 225 A.3d 1083 (Pa. 2020) (applying Election Code "sore loser" provision). Section 951.1 of the Election Code, referred to as the "disaffiliation" provision, specifically addresses "eligibility" and provides:

> Any person who is a registered and enrolled member of a party during any period of time beginning with thirty (30) days before the primary and extending through the general or municipal election of that same year shall be ineligible to be the candidate of a political body in a general or municipal election held in that same year nor shall any person who is a registered and enrolled member of a party be eligible to be the candidate of a political body for a special election.

25 P.S. § 2911.1; *see generally Matter of Nomination Papers of Mlinarich*, 266 A.3d 1189 (Pa. Cmwlth. 2021) (single-judge opinion) (applying "disaffiliation" provision of Election

---

Section 912.2(a) of the Election Code, 25 P.S. § 2872.2(a). Candidates of minor political parties and political organizations who wish to appear on the municipal or general election ballot may not participate in primaries and must file nomination papers to appear on the municipal or general election ballot. Sections 912.2 and 951 of the Election Code, 25 P.S. §§ 2872.2, 2911.

Code). These are the types of nomination petition and paper challenges cognizable under Section 977's "entitled to file" provision.

Resolution of this case, however, is not as simple as choosing among the *Jones* majority result, the plurality opinion, and Justice Hutchinson's dissenting opinion. This case is principally one of statutory construction, where "[t]he object . . . is to ascertain and effectuate the intention of the General Assembly." 1 Pa. C.S. § 1921(a). As the majority notes, shortly after *Jones* was decided, the General Assembly passed Act 4 of 1985 (Act 4),[10] which, *inter alia*, amended Section 910 of the Election Code, relating to the contents of a candidate affidavit. Act 4 left unaltered the requirement in Section 910 that the candidate affirm generally that he or she "is eligible" for the office sought. Section 3 of Act 4, however, added the following language to Section 910 specifically addressed to affidavits for candidates for the General Assembly:

> In cases of petitions for candidates for the General Assembly, the candidate's affidavit shall state (1) that the candidate will satisfy the eligibility requirements contained in sections 5 and 7 of Article II of the Constitution of Pennsylvania; (2)(i) that in the case of a candidate for the office of Senator in the General Assembly that the candidate will be twenty-five (25) years of age on or before the first day of the term for which the candidate seeks election or (ii) that in the case of a candidate for the office of Representative in the General Assembly that the candidate will be twenty-one (21) years of age on or before the first day of the term for which the candidate seeks election; (3) that the candidate shall have been a citizen and inhabitant of Pennsylvania four (4) years and an inhabitant of the respective district one (1) year next before the election (unless absent on the public business of the United States or of this State); and (4) that the candidate has not been convicted of embezzlement of public moneys, bribery, perjury or other infamous crimes.

In addition, Section 5 of Act 4 amended Section 977 of the Election Code. While retaining the "entitled to file" language in that section discussed by the Court in *Jones*, Section 5 of

_____

[10] Act of April 18, 1985, P.L. 5.

Act 4 amended Section 977 to add a *new, separate basis* on which a nomination petition or paper can be challenged: "[I]f any accompanying or appended affidavit contains a material defect or error, it shall be set aside. For purposes of this section, a nomination petition or paper shall include all affidavits required to be filed with such nomination petition or paper under this act."

It is fair to presume that the General Assembly amended Sections 910 and 977 of the Election Code in response to this Court's majority result and plurality opinion in *Jones*. *Cf. Buehl v. Horn*, 728 A.2d 973, 980 (Pa. 1999) ("The General Assembly is presumed to concur with the interpretation placed upon a statute if it does not amend the statute within a reasonable time."). In so doing, the General Assembly retained the language interpreted by the *Jones* plurality—"eligible for such office" in Section 977 and "entitled to file" in Section 910.[11] It added new language to deal directly with residency challenges to candidates for the General Assembly—an amendment that would not have been necessary if the General Assembly merely wanted to adopt Justice Hutchinson's dissent in *Jones*. After the Act 4 amendments, it was clear that the General Assembly intended the courts, under Section 977 of the Election Code, to set aside the nomination petitions and papers of any candidate for membership in the General Assembly who could not meet the constitutional qualifications—not because the candidate was "not . . . entitled to file" or was "not eligible for such office," but under the new authority to police for material

---

[11] *See* 1 Pa. C.S.§ 1922(4) (providing statutory construction presumption that "when a court of last resort has construed the language used in a statute, the General Assembly in subsequent statutes on the same subject matter intends the same construction to be placed upon such language"). I acknowledge, of course, the argument that a plurality opinion is not a majority opinion of this Court. Nonetheless, it is quite reasonable to assume, if not presume, that if the General Assembly disagreed with the plurality's construction of Sections 910 and 977 of the Election Code, Act 4 would have been the logical place to lodge that disagreement.

defects or errors the newly-required affidavit for General Assembly candidates relating to constitutional qualifications.

Following the passage of Act 4, the Commonwealth Court decided *Nomination Petition of Street*, 516 A.2d 791 (Pa. Cmwlth. 1986) (single-judge opinion). As the majority points out, the Commonwealth Court held that the passage of Act 4 "addressed *the deficiency*" in the power of the courts to apply the constitutional residency requirement to candidates for the General Assembly under the Election Code. *Street*, 516 A.2d at 792 (emphasis added). The Commonwealth Court explained:

> Pursuant to the legislative authority granted by Act 4 of 1985, we are now confronted with a situation which requires us to review a candidate's qualifications challenged by a petition alleging a defect in the candidate's affidavit. As the *Jones* court acknowledged, a false candidate's affidavit is a fatal defect which cannot be amended and would require the setting aside of the nomination petition.

*Id.* at 793. On the merits, the Commonwealth Court held that the objector failed to meet her burden of proof in establishing that the candidate did not satisfy the constitutional residency requirement and dismissed the petition to set aside the candidate's nominating petition. *Id.* at 795-96.

In *In re Prendergast*, 673 A.2d 324 (Pa. 1996), although this Court did not explicitly adopt the *Jones* plurality, it approved the Commonwealth Court's reasoning in *Street* that the Act 4 amendments to the Election Code remedied the *Jones* majority result and the plurality's rationale that the constitutional residency requirement for members of the General Assembly was not justiciable under the Election Code. *Prendergast*, 673 A.2d at 325. There, this Court determined that the candidate was a citizen of a state other than Pennsylvania during part of the four-year period preceding the General Election. *Id.* at 328. Her candidate affidavit to the contrary was, therefore, false, and the Court

affirmed the Commonwealth Court's decision to set aside the candidate's nomination petition under Section 977 of the Election Code. *Id.*

Following *Prendergast*, the General Assembly again amended the Election Code. Act 18 of 1998 (Act 18),[12] *inter alia*, deleted the Act 4 amendments to Sections 910 and 977 discussed above and that formed the basis of the Commonwealth Court's jurisdictional determination in *Street*, which this Court adopted in *Prendergast*. The majority, embracing a post-Act 18 single-judge opinion from the Commonwealth Court,[13] contends that Act 18, and by extension Act 4, were nothingburgers, because, adopting Justice Hutchinson's dissent in *Jones*, the courts always had the authority under Section 977 to adjudicate challenges to the constitutional eligibility of General Assembly candidates. (Maj. Op. at 21-23.) "Nothing in the amendment history of Section 977," the majority opines, "much less its legislative history, shakes our view." (*Id.* at 22.)

The majority cites to no case or principle of statutory construction in support of the proposition that courts should glean absolutely nothing in terms of the General Assembly's intent when the General Assembly amends a statute. Here, the General Assembly amended the Election Code *not once but twice* to deal with the question of whether the courts may apply to candidates the constitutional residency qualification for General Assembly members through the Election Code—first by expressly granting courts the authority (in response to *Jones*) and later by purposefully removing that authority (in response to *Prendergast*). The majority laments that "[i]f the Legislature felt

---

[12] Act of February 13, 1998, P.L. 72.

[13] *Nomination Petition of Pippy*, 711 A.2d 1048 (Pa. Cmwlth.) (single-judge opinion), *aff'd per curiam*, 709 A.2d 905 (Pa. 1998). When the court decided *Pippy*, the Internal Operating Procedures of the Commonwealth Court provided that single-judge opinions of the court, even if reported, could not be cited as binding precedent.

as strongly as some have suggested about denying our authority over these contests, *it could have done more than leave us to derive that intention by inference.*" (Maj. Op. at 23 (emphasis added).)  But it did.

Article III, section 3 of the Pennsylvania Constitution commands the General Assembly to set forth clearly the subject of each bill in its title.[14]  The title of House Bill 1760, which became Act 18, is lengthy.  Within the title, however, is the following subject:  "removing certain jurisdiction from the courts."  The only provisions in Act 18 that even arguably go to the jurisdiction of the courts, particularly in light of *Jones* and *Prendergast*, are the amendments to Sections 910 and 977, removing the authority of the courts expressly conferred by Act 4.[15]  Accordingly, the General Assembly clearly expressed its legislative intent in Act 18 to remove the jurisdiction previously given to the courts under Act 4.  *See Davey v. Ruffell*, 29 A. 894, 895 (Pa. 1894) ("We may gather the intent of the legislature from the title of the act, and from the preamble.").  The intent of the General Assembly, so clearly and unambiguously stated, must be given effect.[16]  *See*

---

[14] "No bill shall be passed containing more than one subject, which shall be clearly expressed in its title, except a general appropriation bill or a bill codifying or compiling the law or a part thereof."  Pa. Const. art. III, § 3.

[15] The majority correctly notes that, under the Statutory Construction Act, 1 Pa. C.S. § 1924, "[t]he title and preamble of a statute may be considered in the construction thereof."  Here, the majority claims authority to ignore the title of Act 18 entirely, ascribing it no value or meaning under the view that the "operative text [of the Election Code] is unambiguous."  (Maj. Op. at 23 n.16.)  Respectfully, "[t]he legacy of pre-[Act 18] decisions . . . as well as the division among the Justices in [*Jones*], suggest otherwise."  *Leadbitter v. Keystone Anesthesia Consultants, Ltd.*, 256 A.3d 1164, 1188 (Pa. 2021) (Wecht, J., concurring).

[16] If the majority and I agree on one thing (*see* Maj. Op. at 21-23), perhaps it is that the "remarks and understanding of individual legislators[] [are] not relevant in ascertaining the meaning of a statute."  *McCormick v. Columbus Conveyor Co.*, 564 A.2d 907, 910 n.1 (Pa. 1989).  I, however, would hardly consider the constitutionally required title of an Act of the General Assembly, signed by the Governor, a mere "nook or cranny."  (Maj. Op. at 22.)

*Mercury Trucking, Inc. v. Pa. Pub. Util. Comm'n*, 55 A.3d 1056, 1067 (Pa. 2012) ("The object of statutory construction is to ascertain and effectuate the General Assembly's intent."). The majority's analysis in this case and the Commonwealth Court's analysis in *Pippy* are clearly at odds with the General Assembly's clear and express intent in Act 18. Regardless of how one might feel about the *Jones* plurality and dissenting opinions, subsequent legislative history has rendered any debate over *Jones* inconsequential.

Further, the majority's approach inserts judicial review of a constitutional residency qualification for elected members of the General Assembly into the Election Code, making it applicable to candidates. Doing so materially diminishes, if not entirely neuters, the exclusive power of the General Assembly to assess the residency qualification of its members under Article II, section 9 of the Pennsylvania Constitution. Courts will essentially be culling the herd for the General Assembly. The majority's approach also creates the potential for conflict, should, for example, a court reject a residency qualification challenge to a Senate candidate's nomination petition or papers, only for the Senate to determine later that the successful candidate (Senator-elect) does not meet the constitutional residency qualification under Article II, section 5. Perhaps worse, a court could strike a person's nomination petition under circumstances where, if the person prevailed in the election, the Senate would have found that the Senator-elect met the constitutional residency requirement. The majority's decision in this case opens the door to these possible conflicts between coordinate branches of government.

Turning to *Baker v. Carr*, 369 U.S. 186 (1962), and the question of whether the residency of a candidate for the General Assembly is a nonjusticiable political question, I note, again, that there is no provision in the Pennsylvania Constitution that imposes a residency requirement on candidates for the General Assembly. Here, the majority attempts to apply the Article II, section 5 residency qualification applicable to members of

the General Assembly to candidates. Article II, section 9, however, is a "textually demonstrable constitutional commitment" of application and enforcement of Article II, section 5 to each House of the General Assembly, not to the courts. *Baker*, 369 U.S. at 217. Undertaking an assessment of member residency qualification at the candidate stage unquestionably limits, if not eliminates, the General Assembly's constitutional power to judge the residency qualifications of its members. It thus is impossible for the courts to enter into that inquiry under the Election Code "without expressing lack of the respect due" to the General Assembly. *Id.* And, as explained above, there is "the potentiality of embarrassment from multifarious pronouncements" by the courts and the General Assembly on the constitutional residency question. *Id.* Unlike the majority, then, I conclude that this case presents a nonjusticiable political question warranting dismissal. *Id.*

To summarize, the Pennsylvania Constitution does not impose a residency requirement on candidates who seek election to the General Assembly. Application and enforcement of the constitutional residency qualifications for members is clearly and expressly delegated to each House of the General Assembly, and not to the courts. To the extent there was any question following *Jones* as to whether Sections 910 and 977 of the Election Code could be read to confer implicitly on the courts the authority to apply the constitutional residency qualification for members to candidates, the passage of the Act 4 amendments and the subsequent repeal of those amendments by Act 18, wherein the General Assembly clearly and unambiguously set forth its intent to "remov[e] certain jurisdiction from the courts," resolved that question. For these reasons, I would have affirmed the Commonwealth Court's decision below.